# Exhibit A

1

1 - 225

## IN THE UNITED STATES DISTRICT COURT

### FOR THE

### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LUCIA ENICA, | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CIVIL ACTION NO. |
| | ) 04-11468-DPW |
| ANTHONY PRINCIPI, as he is | ) |
| Secretary of Veterans Affairs | ) |
| of the Department of Veterans | ) |
| Affairs, | ) |
| Defendants. | ) |

THE ORAL DEPOSITION OF LUCIA ENICA QUELIS SILVA, held pursuant to Notice, and the applicable provisions of the Federal Rules of Civil Procedure, before Rosemary Gormley, a Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of the United States Attorney, John J. Moakley Federal Courthouse, Suite 9200, 1 Courthouse Way, Boston, Massachusetts, on Wednesday, November, 9, 2005, commencing at 10:04 a.m.

ORIGINAL

APPEARANCES:

For the Plaintiff:

    SANFORD A. KOWAL, ESQ.
    56 Chestnut Hill Ave
    Boston, MA  02135
    (617) 562-8100

For the Defendant:

    DAMIAN W. WILMOT, ESQ.
    Assistant U.S. Attorney
    Office of the United States Attorney
    1 Courthouse Way
    Boston, MA  02210
    (617) 748-3100

Also Present:

    Andrew Polling, USAO Intern

1     A     No.   Mary something, but I don't remember her last

2  name.

3     Q     Okay.   So you said after McLean, you left for the

4  VA?

5     A     I left for the VA.

6     Q     Okay.

7     A     I did go back to McLean, though.

8     Q     You did?

9     A     Yes.

10    Q     Okay.

11    A     I always go back.   I went from ---

12    Q     Well, let's focus on the VA for a moment.

13    A     Okay.

14    Q     And I'll let you get to the McLean.

15          So when did you start at the VA that first time?

16    A     In 1994.

17    Q     Okay.   And what position were you hired for?

18    A     Registered nurse in psychiatry.

19    Q     Okay.   And which VA Hospital were you working out

20  of?

21    A     Jamaica Plain.

22    Q     Okay.   And who was your supervisor at that time?

23    A     Mary Farren.

24    Q     What was the last name?

25    A     Farren.

40

```
 1        A    I applied to the VA to work in psychiatry ---

 2        Q    Mm-hm.

 3        A    --- only.

 4        Q    Okay.  Now you said that you applied for that

 5   position knowing what your limitations were?

 6        A    Correct.

 7        Q    What limitations did you have when you first

 8   started at the VA?  Physical limitations?

 9        A    I have history of polio with multiple deficits to

10   my right leg.  I -- I wasn't aware at that time of any other

11   deficits.

12        Q    So at the time that you were hired at the VA, you

13   just be clear for me, again, what conditions you were

14   suffering from at that time?

15             MR. KOWAL:  Excuse me.  I didn't -- I didn't -- I

16   didn't quite follow it.  I apologize.  Could we have the

17   question, again, back?  I don't -- I didn't hear it.  I

18   didn't hear it clearly.

19             MR. WILMOT:  Okay.

20             MR. KOWAL:  I apologize to you.

21             MR. WILMOT:  I'll restate it.

22             MR. KOWAL:  Thank you.

23        Q    BY MR. WILMOT:  At the time that you were hired by

24   the VA can you just clearly tell me what conditions you were

25   suffering from at that time?
```

1          MR. KOWAL:  Objection.

2          THE WITNESS:  Should -- should I answer?

3          MR. KOWAL:  Yes.

4          THE WITNESS:  Yes?

5          MR. KOWAL:  You should answer.

6          THE WITNESS:  Okay.

7     A    I -- I have history of polio to the right leg at

8  the age of ten month with multiple deficits to the right,

9  lower extremity, to my right leg.

10         I have -- I had history of fracture to the right

11 femur with history of reconstructive surgery years later,

12 which left me with some more deficits to the right leg.

13         I had history of Hepatitis B, post transfusion.

14         I have history of tonsil removal.

15         I have history of appendix removal.

16         I -- I ---

17    Q    BY MR. WILMOT:  Let me just stop you for a moment.

18         MR. KOWAL:  Whoa, whoa, whoa.

19    A    Yes.

20    Q    BY MR. WILMOT:  I'm not -- I'm not so much

21 concerned with what your history was, but in terms of when

22 you started your job at the VA, what physical conditions

23 were you suffering from at that time?

24    A    Those were all my physical conditions.

25    Q    Okay.

. 42

1    A    And the consequences of this physical conditions.

2    Q    Okay.  Can you explain to me, then, what the

3  consequences were, the physical consequences of the polio

4  that you had when you were ten I'm sorry, of ten months?

5    A    Well, I ---

6        MR. KOWAL:  And this was the time she was hired?

7        MR. WILMOT:  At the time she was hired.

8    A    I just explained you, I had -- I had multiple

9  deficits to the right leg.  I had -- my right leg was

10  shorter than my left leg.  I have stiffness of ankylosis of

11  the right ankle and I have -- I have deficits that I

12  personally right now, this moment, cannot remember exactly.

13  But if you read the fitness of duty done by Dr. Harris, the

14  chief of orthopedics services at the VA a year later, you

15  could see for yourself ---

16    Q    BY MR. WILMOT:  But that would show ---

17    A    --- described.

18    Q    That would show me a year later, though, correct?

19  It wouldn't show me the day that you started at the VA?

20    A    Yes, wouldn't show you the date that I started at

21  the VA.

22    Q    And that's what I'm asking.

23    A    The date that I started at the VA, I was -- I had

24  to have a physical examination, which was done by the VA

25  employees health person, Denni Woodmansee and he -- and I --

43

1      I explained all my medical history.

2          Q     Okay.

3          A     I don't know if he did a fitness for duty, but I

4      did give the accurate history of my medical history.

5          Q     Now you identified for me, the best you could, it

6      was the three things I've written down, and if I miss

7      anything, please let me know.   I've written down the

8      muscular deficits that you described in your right leg, you

9      said one of your legs was shorter than the other. I believe

10     you said your left leg.   Is that accurate?

11         A     No, the right leg is shorter.

12         Q     Okay.   And you said stiffness of your right ankle?

13         A     Yes.

14         Q     Was there anything else in the way that your

15     history manifested itself in your physical condition at the

16     time that you started at the VA?

17         A     I cannot recall exactly, but if we review my

18     medical records, we could definitely understand.   At this

19     moment, I'm too anxious to remember everything accurately.

20         Q     Do you want to take some time?

21         A     No.   I should have my physical -- my medical

22     records in front of me to explain.

23         Q     This ---

24               MR. WILMOT:   Well, let's go off the record for a

25     moment.

44

1          MR. KOWAL:  Yes.  She didn't say that at all.

2          (Off the record at 11:05 a.m. to 11:14 a.m.)

3      Q    BY MR. WILMOT:  When did you first begin to suffer

4  from the muscular deficiency that you described?

5      A    At the age of ten month.

6      Q    Okay.  And how did that affect your everyday life?

7      A    I -- I was limping, which was evident and that's

8  becoming more evident as the time goes by.

9      Q    Mm-hm.

10     A    I could not have use of my right leg, the same as

11  you have.  My left leg, I could not lift my leg, I could not

12  use certain muscles.

13     Q    Okay.

14     A    So I could not run properly.  I could not

15  participate in school at physical exercise classes.

16     Q    Mm-hm.

17     A    I was exempted.  I was going to physical therapy,

18  though, all my life.

19     Q    Mm-hm.

20     A    I could not drive a regular car.  I had to have a

21  car adjusted for me to be driven with my left leg, because I

22  don't have the use of the muscles.

23          I -- I did not have a good balance on my both

24  legs, because my right leg was weaker.  I could not carry

25  properly a cup of coffee because I was dropping everything.

1    would not take care of myself by limiting the physical

2    activity to what I could do comfortably on both legs ---

3          Q    Mm-hm.

4          A    --- I will end up having consequences, which I

5    did.

6          Q    Mm-hm.

7          A    I developed severe arthritis in my right knee and

8    my disability progressed rapidly after a while.

9          Q    Okay.   Now you also told me that your right leg is

10   shorter than your left leg?

11         A    Yes.

12         Q    How has the affected your everyday life?

13         A    When I -- when I was nineteen, I wanted to correct

14   that and I had a reconstructive surgery done.

15         Q    Mm-hm.

16         A    And they elongated my right leg, which was --

17   which was really close to my left leg.   Probably like the

18   same shortness as everybody has.   People do tend to have one

19   leg a tiny little bit shorter than the other.

20         Q    Mm-hm.

21         A    At least some people.   But when I started to

22   become older, and I started to develop arthritis in my right

23   knee, because of the arthritis and my inability to use

24   proper muscles, I don't know what happened, the leg remained

25   even shorter.

1    A    Coulter.  I think it's C-u-l-t-e-r (sic).  I'm not

2  100-percent sure.

3    Q    And when was this conversation?

4    A    That was in 1995, before 12C closed.

5    Q    Was ---

6    A    I'm sorry, before 13C closed.  13C closed.

7    Q    And was her -- you said Sissy -- you told Sissy

8  McVey and Carol Coulter this.  Was there anyone else in the

9  room at the time?

10    A    Oh, I told everybody.  I told Mary Farren, but,

11  you know, I -- Mary Farren was my head nurse, Sissy McVey

12  was the assistant chief of nursing, Carol Coulter was the

13  chief of nursing.

14    Q    Okay.  When you first told Sissy McVey and Carol

15  Coulter this information, was there anyone else in the room

16  at the time?

17    A    Actually, when I first told Sissy McVey and Carol

18  Coulter was a staff meeting.

19    Q    Okay.

20    A    There were many people in the room.

21    Q    And was this the first time that you told someone

22  in management that you physically could not work in another

23  unit from psychiatry?

24    A    If you do not consider Mary Farren management, she

25  was my head nurse.

1    Q   Well, that would make her manager, right?

2    A   Right.

3    Q   So when did you first ---

4    A   When ---

5    Q   When did you first ---

6    A   When -- when ---

7    Q   --- Mary Farren?

8    A   When I first got the news that the unit is going

9 to be closed and they were intending to move me in a medical

10 unit.

11    Q   Okay.  And do you remember when you had this

12 conversation with Mary Farren?

13    A   Not exactly, but prior to that move.

14    Q   Was that sometime in 1995?

15    A   Yes.

16    Q   And you told Mary Farren that you could not work

17 in any other unit because of ---

18    A   On a medical unit, not any other unit.

19    Q   Okay.  So not in the medical unit?

20    A   Right.

21    Q   And did you give her a reason as to why you could

22 not?

23    A   Yes.

24    Q   And what did you tell her?

25    A   I have polio and I have multiple deficits, I

60

1    cannot do the physical part of that job.

2        Q    And what was her response to that?

3        A    She didn't give me any response, but I do remember

4    the response she gave me after I told Sissy and Carol

5    Coulter.

6        Q    Okay.  So first you had ---

7        A    Yes.

8        Q    --- this conversation with Mary Farren and later

9    you said you told Sissy and Carol during a staff meeting?

10       A    Yes.

11       Q    Okay.  And what was Sissy McVey's ---

12       A    It was a staff meeting focused on that change.

13       Q    Okay.

14       A    It was a meeting with the staff to discuss the

15   change.

16       Q    What was Sissy and Carol Coulter's response to

17   that information?

18       A    Carol Coulter said, it's too late now.

19       Q    Okay.

20       A    And I said, it's not too late, it's not too soon,

21   it's a fact, I have polio, I cannot work, and I have

22   physical deficits, that I cannot work in a medical unit.

23       Q    Mm-hm.

24       A    And Sissy said, calm down, Lucia, we'll talk about

25   it later.

1     Q    Okay.

2     A    And then I went to my unit and I told Mary Farren.

3  She actually -- Mary Farren sent me to that meeting to talk

4  to them about my physical problem and I said, well, Sissy

5  McVey said that she will take care of it, she will talk

6  about it later.  And Mary Farren was very upset.  She said,

7  why did she so?  But she never gave me an explanation.

8     Q    Did you eventually have a meeting with Sissy McVey

9  or Carol Coulter about ---

10    A    No.

11    Q    --- this?

12         Okay.  So were you eventually transferred out of

13  the psychiatry unit?

14    A    No.  Actually, I was transferred into the

15  psychiatry?

16    Q    Okay.  So you were never transferred into a

17  medical unit ---

18    A    No.

19    Q    --- at that time?

20    A    At that time.

21    Q    Now, this was a Jamaica Plain ---

22    A    Yes.

23    Q    --- before the transfer?

24    A    Yes.

25    Q    Where were you transferred to?

62

1      A    To 12C.

2      Q    12C is where?

3      A    12C is Jamaica Plain.  Was another psychiatric

4   unit.

5      Q    I see.  Okay.

6      A    There were three psychiatric units, 13C, 13B and

7   12C.

8      Q    Mm-hm.

9      A    And was one substance abuse unit, 7C.

10     Q    Mm-hm.  Okay.

11     A    At that time.

12     Q    So you were still in a psychiatric unit?

13     A    Right.

14     Q    Was there any discussion to accommodate you in any

15  way when you were moved to 12C?

16     A    Yes, it was, between Beverly Reardon.

17     Q    Huh-huh.

18     A    She told me to bring a note from my doctor

19  regarding my, my disability and what I can do and what I

20  cannot do, and they would try to see what they are doing,

21  how they could accommodate me.

22     Q    This was in 1995?

23     A    No, actually later.  At that very moment, there

24  wasn't any discussion.

25     Q    At that very moment?  Which moment?

63

1    A    I mean, after the 13C closed, the psychiatric

2  unit, when I was moved to the other unit, there hadn't been

3  a discussion.  They just -- I was moved there in 1995.

4    Q    Okay.  When was this conversation with Beverly

5  Reardon?

6    A    After I complained one day, because I could not

7  take a patient on a stretcher to the ECT, but I was not

8  feeling well, I had pain.

9    Q    Okay.  Do you remember when that was?

10    A    I don't remember exactly the date, but I remember

11  the facts that followed that.

12    Q    Do you remember what year it was?

13    A    Yes.  In 1996.

14    Q    Okay.  So what followed that?  I mean, after you

15  complained about this to Beverly Reardon?

16    A    She told me to go to my doctor and bring a

17  document to let them know what I can do and what I cannot

18  do.

19    Q    And did you do that?

20    A    Yes.

21    Q    Who did you see to get that note?

22    A    I seen my orthopedist, Dr. Wright.

23    Q    Okay.  And this was in 1995?

24    A    It was in ---

25    Q    '96?  I'm sorry.

```
 1        A     '96.

 2        Q     Okay.

 3        A     Yes.

 4              MR. WILMOT:   Will you mark this, please?

 5                            (Enica Deposition Exhibit 4

 6                            marked.)

 7              MR. WILMOT:   Thank you.

 8        Q     BY MR. WILMOT:   I'm showing you what's been marked

 9    as Exhibit 4.  Do you recognize that document?

10        A     Yes.

11        Q     Can you identify what it is, please?

12        A     It's a medical examination, which states my

13    limitations, physical limitations, at that time.

14        Q     Okay.

15        A     And it was given for me to take it to work.

16        Q     Okay.  And could you just state for the record

17    what your doctor or what the note says your limitations are?

18        A     Cannot bend or crouch, no lifting over 15 pounds,

19    no -- no ---

20              MR. KOWAL:   Repetitive, I think.

21        A     No repetitive low back activity, avoid repetitive

22    or heavy pushing and pulling, not suited for med/surg floor

23    nursing.  It's not possible to spell out restrictions for

24    all circumstances.  Patient must be permitted some

25    discretion.
```

1    Q    BY MR. WILMOT:  Okay.  And who signed that note?

2    A    Dr. Richard, I think, Wright.

3    Q    Okay.  And you were in the psychiatry unit at that

4 time?

5    A    Yes.

6    Q    Okay.  And you said that you got this note at

7 Beverly Reardon's instruction?

8    A    Yes.

9    Q    Okay.  And what did you do with that note, once

10 you received it from your doctor?

11    A    I gave it to her.

12    Q    Okay.  And what was her response to that

13 information?

14    A    She told me -- after a little bit, she told me

15 that they are thinking to assign me to be the charge nurse

16 of the unit.

17    Q    Okay.

18    A    That will be -- it's -- it's not like managerial

19 position, it's just to be in charge of the unit for that

20 shift.

21    Q    Okay.

22    A    And I said, okay.  And then they said they changed

23 their mind and they placed into the position of the charge

24 nurse of the unit another nurse.

25    Q    Let me back up a bit.  When were you told that

1        A        And Pauline was sitting in the big office and she

2    told me, okay, you can go to your floor.

3        Q        Okay.  That was immediately after the exam?

4        A        Immediately after.  And when I arrived to the

5    floor, Beverly Reardon told me, you have to go on the

6    medical unit and be floated for the rest of the day for a

7    number of hours, that medical unit.

8        Q        Okay.  Were you still assigned to the psychiatric

9    unit at that time?

10       A        Yes.

11       Q        Okay.  So they were just asking you to float?

12       A        Yes.  They were doing this floating staff to the

13   medical unit.

14       Q        Okay.

15       A        Yeah.

16       Q        Did Dr. Harris tell you anything else after ---

17       A        He didn't tell me anything.

18       Q        You have to let me finish ---

19       A        Yes.

20       Q        --- or the transcript looks crazy.

21               Did Dr. Harris say anything else to you after he

22   finished his examination that day?

23       A        No.

24       Q        He did not?  Okay.

25               MR. WILMOT:  Let's mark this as the next exhibit,

70

1   please.

2                                   (Enica Deposition Exhibit 6

3                                   marked.)

4        Q    BY MR. WILMOT:   I'm showing you what's marked as

5   Exhibit 6.  Do you recognize this document?

6        A    Yes.

7             MR. KOWAL:   Just a second, please.

8             Okay.

9        Q    BY MR. WILMOT:   Can you identify what it is,

10  please?

11       A    It's the employee's fitness for duty.

12       Q    Okay.   So these are Dr. Harris' notes of his

13  examination of you?

14       A    Yes.

15       Q    Will you turn to the second page, the last

16  paragraph that begins with:  Plan.  It says:  I told all

17  this to Ms. Enica and suggested that she go to the nursing

18  service with this information as soon as possible to work

19  out with them exactly what will be done by the nursing

20  service.  Do you see that?

21       A    Yes.

22       Q    Did he give you any information to take to the

23  nursing service?

24       A    No.

25       Q    He did not?  Okay.

1  of my profession, so I could have done it.  I tried to

2  obtain other assignments.

3         I interviewed for a number of positions in

4  outpatients, psychiatric nursing at Causeway Street, and I

5  was denied all the time for every position that I applied

6  for.  I applied for a position as case manager in

7  psychiatry.  I was denied.

8      Q    I'm going to have to stop you ---

9      A    Yeah.

10     Q    --- for a moment.

11     A    Yes.

12     Q    But between 1996 and 2002, did you speak, again,

13  to management about your physical conditions?

14     A    No.

15     Q    Okay.

16                        (Enica Deposition Exhibit 8

17                        marked.)

18     Q    BY MR. WILMOT:  I show you what's been marked as

19  Exhibit No. 8.  Do you recognize that document?

20     A    Yes.

21     Q    Can you identify what it is for me, please?

22     A    Requests for medical information have submitted

23  documentation that indicated you have medical condition that

24  precludes the performance function of psychiatry staff

25  nurse.  Additional medical documentation needed to make a

1    that, in that complaint, correct?

2        A    I'm sorry?

3        Q    The EEOC did not find in your favor with that

4    complaint that you filed in 1997; is that correct?

5        A    They told me it was bad management and not

6    discrimination.

7        Q    Okay.  So they did not find discrimination?

8        A    That's what they told me.  I didn't follow further

9    than that.  I didn't know I was needing to.  My lawyer left.

10   Mr. Bovarnik just showed up for that interview.

11       Q    Mm-hm.

12       A    And he never explained me what the document meant

13   at the end, so I just threw it in the attic and I never

14   looked at it.

15       Q    Okay.  I show you what's been marked as Exhibit

16   14, and I'll ask, again, if you recognize this document?

17            (Pause.)

18       A    It seems like ---

19       Q    It seems like what?

20       A    Like is the EEOC's response to my complaint ---

21       Q    Okay.

22       A    --- in that proceeding.

23       Q    If you could turn back to the first page of the

24   document?

25       A    Mm-hm.

1      Q    The very first page here.  It's dated November

2    25th, 1998, to Jeffrey Bovarnik.  And Jeffrey Bovarnik,

3    again, was your representative at the time?

4      A    He was the lawyer that replaced my lawyer.  My

5    lawyer left in the middle of all this, and Mr. Bovarnik came

6    at that hearing.

7      Q    Okay.  November 25th, 1998, was Mr. Bovarnik your

8    lawyer?

9      A    Probably.

10     Q    Okay.

11     A    I -- I was very confused about everything.  I

12   never understood what happened.

13     Q    You were confused at whether or not he was your

14   lawyer?

15     A    Yes.  They told me, you don't need a lawyer to go

16   through the EEO process.

17     Q    Mm-hm.

18     A    But I wanted a lawyer, because I didn't know how

19   to go through the process.  I didn't understand it.  And

20   they said, okay, you can have a lawyer, but he can just sit

21   here with you, he cannot do anything.  So he was there,

22   sitting with me.

23     Q    Okay.  But he was ---

24     A    He didn't advise me, he didn't tell me what to do,

25   so if this was ---

1    Q    Mm-hm.

2    A    --- my lawyer, then he was my lawyer.  I didn't

3    even know ---

4    Q    Well, I'm ask ---

5    A    --- if he was familiar with the case.

6    Q    Did you pay him for his services?

7    A    I paid for the services at the beginning when I

8    hired that firm ---

9    Q    Okay.

10    A    --- but they give me Mr. Matthew, my lawyer, and

11    Mr. Matthew just left.

12    Q    Okay.  Now it says here on this first page:  If

13    dissatisfied with the enclosed decision, the complainant may

14    appeal in accordance with the statement of appeal rights

15    contained in this decision.  Do you see that there?

16    A    Yes.

17    Q    Did you ever appeal this decision?

18    A    No.

19    Q    You did not?

20    A    No.

21    Q    Okay.  After the date of this decision, which

22    again appears to be November 25th, 1998, when did you next

23    speak to the VA about your concerns about your physical

24    condition related to performing your job responsibilities?

25    A    After this decision, Beverly Reardon resigned.

1    reasonable accommodation, and I did.

2        Q    When did you contact employees health?

3        A    I don't know exact date, but ---

4        Q    Do you remember the year?

5        A    If I look at the medical records I can see when I

6    went to my doctor and what happened and ---

7        Q    Okay.

8        A    Yeah.

9        Q    Let me see if this helps you.

10           MR. WILMOT:  Can you mark this, please?

11                        (Enica Deposition Exhibit 15

12                         marked.)

13           MR. WILMOT:  Thank you.

14       Q    BY MR. WILMOT:  Let me show you what's marked as

15   Exhibit 15.

16       A    So this is May 2002.

17       Q    Well, first let me ask you:  Do you recognize that

18   document?

19       A    Yes.

20       Q    Can you identify what it is, please?

21       A    Is -- this is a medical record from my

22   orthopedist, Dr. Provost.

23       Q    Okay.  What's the date on it?

24       A    The date is May 13th, 2002.

25       Q    Okay.  And you went and got this note at whose

108

1    request? Was this at Lisa Cargill's request?

2        A    Not at her request, but her advice.

3        Q    Okay.

4        A    Because I could not get anywhere ---

5        Q    Okay.

6        A    --- with my head nurse.

7        Q    And you gave that note to employees health?

8        A    I also gave it to Mary Farren, also.

9        Q    Okay.  Mary Farren was your immediate supervisor?

10       A    Yes.

11       Q    And when you gave it to Mary Farren, what did you

12   say when you were giving her this note?

13       A    I think she was very upset.  I think after this

14   she started yelling that ---

15       Q    Well, before you get -- what did you say to Mary

16   Farren when you gave her that note?

17       A    Oh, I told her that I have a note from my doctor

18   because I -- I was telling her before that I have difficulty

19   walking and I needed some accommodation and I went to the

20   doctor and this is my note.

21       Q    Well, this is why I keep asking you this question:

22   When did you first -- when, after that final agency

23   decision, which was November 25th, 1998, when did you speak

24   with a VA, a member of VA management, about needing an

25   accommodation?

1    or are you ---

2                  THE WITNESS:  No, no.

3                  MR. KOWAL:  You're still in Jamaica Plain?

4                  THE WITNESS:  Jamaica Plain, yes.

5         Q    BY MR. WILMOT:  Now, the date of this note that

6    you identified, Exhibit 15, is dated May 2002.  Is it

7    possible these conversations with Mary Farren and other

8    members of management at the VA was in 2002?

9         A    Not -- I'm not 100-percent sure, but it might have

10   been before, also.  In 2002, I got very worried that I

11   cannot walk ---

12        Q    Right.

13        A    --- distances any more, and I needed more

14   accommodations.

15        Q    Okay.  So it's possible that you had those

16   conversations before 2002?

17        A    It's possible.

18        Q    Now I know you said that you -- you ended up

19   getting this note from Dr. Provost, and it's dated May 2002,

20   and I think you said that it was at the suggestion or the

21   advice of Lisa Cargill?

22        A    At that time, no.  This was ---

23        Q    Okay.

24        A    --- out of my desperation ---

25        Q    Okay.

1        A    --- because I felt nothing would be done.

2        Q    Okay.  So it's -- tell me why you went to

3    Dr. Provost to get that note, which is marked as Exhibit 15?

4        A    Because I was worried I could not do the walking

5    rounds.  My knee was in excruciating pain, my back was  in

6    pain, and I was worried.

7        Q    So is it your testimony that you -- after getting

8    the note that's marked Exhibit 6, you first started

9    complaining to Mary Farren, nothing was done, and then at

10   some point in May 2002, you went to get an additional --

11   additional documentation from Dr. Provost?  Is that

12   accurate?

13       A    Well, after ---

14            MR. KOWAL:  Yes or no.  Is that accurate?

15            THE WITNESS:  Yes.

16            MR. KOWAL:  Well, that's all you have to say.

17            THE WITNESS:  Yes.

18                        (Enica Deposition Exhibit 16

19                         marked.)

20       Q    BY MR. WILMOT:  I show you what's marked as

21   Exhibit 16, and I'll just represent to you that it's a

22   series of e-mails that's stapled together as a group of

23   e-mails.  Why don't you just take a moment to just look

24   through those ---

25       A    Mm-hm.

1        THE WITNESS:  The subject was in relation to my

2   request for reasonable accommodation and how to go about to

3   obtain this reasonable accommodations.

4        Q    BY MR. WILMOT:  Okay.

5        A    So after receiving certain instructions through

6   the employees health and my supervisors, and following

7   through with bringing the medical records, and also

8   providing in writing, as per employees health instructions

9   on specific things that I could do ---

10       Q    Mm-hm.

11       A    --- not only the limitation, what I could do to

12   work as a psychiatric nurse.

13       Q    So ---

14       A    It's all contained in here.

15       Q    So you started having a dialogue of about an

16   accommodation?

17       A    Right.

18       Q    Now, I notice the date on the first e-mail is May

19   23rd, 2002.  Do you remember what precipitated this

20   exchange?  You were saying before that you weren't getting

21   any response and now it looks like there's a lot of chatter,

22   a lot of dialogue going on.  What got it going with the VA?

23       A    I -- I asked Mary Farren to help me get reasonable

24   accommodation.  She was very upset when I brought the

25   medical record and she was ---

1      Q     Let me slow you down a little bit.  Which medical

2   record are you referring to?

3      A     I'm talking about the note from my doctor.

4      Q     This one here from Dr. Provost, No. 15?  Exhibit

5   15?

6      A     I -- I think -- I don't think so, because this is

7   ---

8            MR. KOWAL:  What do you mean, you don't think so?

9      A     It's dated May 13, and ---

10     Q     BY MR. WILMOT:  Right.

11     A     --- Mary Farren had a very, very hostile, very

12   hostile attitude towards me on May 8th.  So I don't know if

13   this is the document or there is one prior to that.  I don't

14   know.

15     Q     Okay.  So your memory is that you had some

16   conversation with Mary Farren, she got very upset and then

17   that began the dialogue with the VA about finding you an

18   accommodation?

19     A     Yes.  I wrote and ---

20            MR. KOWAL:  Yes or no.

21     A     Yes.

22     Q     BY MR. WILMOT:  Can you explain to me what

23   happened in that exchange of Mary Farren where you said she

24   got very upset?

25     A     Yes.  On May 8th at 7:30, I gave her a -- to Mary

1    had the meeting, the morning meeting, after the morning

2    meeting, then I went to the nursing station.  She starts

3    yelling and screaming in the hallway, coming from the

4    conference room to the nursing station, going back and ---

5        Q    Okay.  Do you remember if there were any -- you

6    said that she was saying it loud enough for others to hear.

7    Do you remember what other nurses were in earshot that heard

8    this go on?

9        A    Basically, the nurses that worked on that floor at

10   that time.  I don't recall who was on duty at that day.

11       Q    Do you remember one of their names?  Anyone that

12   witnessed this whole thing happen?

13       A    Off the top of my head, no, but it can be very

14   easily determined, if you look in the VA records who was on

15   duty on that day, if they keep any records.

16       Q    Okay.  And so anyone who was on duty that day

17   would have heard this; is that what you're saying?

18            MR. KOWAL:  At that time.

19       A    At that time.

20       Q    BY MR. WILMOT:  Okay.  And you do not believe it

21   was Exhibit 15, which is dated May 13, 2002.  You believe

22   there was another note that you gave to Mary Farren?

23       A    I suppose, because it says May 8th.  I couldn't

24   have gave it to her a document that is dated May 13 on

25   May 8th.  I -- I -- it might be a mistake on one of the