121

1    papers, but I don't know.

2        Q    Is it ---

3        A    I'd have to check.

4        Q    Is it possible the note you gave her was

5    Dr. Harris' note?

6        A    I don't think so, because it's not vague.

7    Dr. Harris' note is not vague.

8        Q    Okay.

9        A    It's very ---

10       Q    So you believe that Dr. Provost's note was vague?

11       A    No, I don't believe.  Maybe there was another,

12   another note.

13       Q    Okay.

14           MR. KOWAL:  Do you know -- excuse me.

15           Do you know what provoked her on the -- provoked

16   her?

17           THE WITNESS:  Yes.  I gave her a medical ---

18           MR. KOWAL:  A medical report?

19           THE WITNESS:  Right.

20           MR. KOWAL:  Well, the only ones we have are either

21   Harris' or Provost's.  Do you know of any other?

22           THE WITNESS:  Right.  But we have a number of

23   Dr. Provost's reports.

24           MR. KOWAL:  Okay.  So you don't know which one she

25   saw?

 1            THE WITNESS:  Right.  Yeah.

 2            MR. WILMOT:  All right.

 3                        (Enica Deposition Exhibit 17

 4                        marked.)

 5       Q    BY MR. WILMOT:  Let me show you what's marked at

 6  Exhibit 17.  Do you recognize that document?

 7       A    Yes.

 8       Q    Can you identify what it is for me, please?

 9       A    It's a -- it's a memorandum from the VA Medical,

10  Medical Center, and it's in regard to accommodations for me.

11       Q    Okay.  And it's date -- what's the date on this

12  document?

13       A    June 28, 2002.

14       Q    Now this document says here that after meeting

15  with you, Mr. Warfield and Ms. McVey, I guess, discussed

16  with you the scope of practice for a registered nurse in the

17  crisis stabilization unit at West Roxbury Campus, and you

18  agreed to provide all functions with the following

19  exceptions.  Do you see that there?

20       A    Yes.

21       Q    And the exceptions says that you would not

22  participate  in the physical aspect of any crisis

23  intervention, such as a response to a Code Green.  And it

24  says this does not exclude you from responding, but limited

25  your involvement to nonphysical aspects of such a response.

123

1    And it appears to be the only limitation that this is

2    placing on you.

3              Can you describe to me this meeting that you had

4    with Mr. Warfield and Ms. McVey, what was discussed and what

5    you did agree on in that meeting?

6    A    We had a meeting and the meeting was in regard to

7    me being moved to West Roxbury, to the crisis stabilization

8    unit.

9    Q    Okay.

10   A    And I -- I pointed out that I have physical

11   limitations and that I will need some accommodations.

12   Q    Now when you, you know, when you just went through

13   the packet of information here, Exhibit 16, where there was

14   some discussion about providing you an accommodation, did

15   you know at that time that you would be -- that you were

16   going to be transferred to the crisis stabilization unit?

17   A    No.

18   Q    You did not?  So after the discussions that are

19   documented in Exhibit 16, you found out thereafter that you

20   were going to be transferred?

21   A    Yes.

22   Q    Do you remember when you found out that you were

23   going to be transferred to crisis stabilization unit at West

24   Roxbury?

25   A    Yes.  I received the decision from Sissy McVey and

1   Karen Bassett, and I was told I would be transferred there.

2       Q    Was it addressed solely to you?

3       A    That decision, yes.

4       Q    Okay.  Were you the only nurse out of your unit

5   being transferred to the crisis stabilization unit?

6       A    No.

7       Q    Who else was being moved there?

8       A    Sue Vickery, T. Pelie (phonetic), Ed Cramer -- no,

9   no, not Ed Cramer.  I forget this other name.  Jack -- I

10  don't remember everybody's name.

11      Q    Okay.

12      A    There were ---

13      Q    Was it a number of people?

14      A    Yes.

15      Q    Okay.  Do you remember how many people?

16      A    Probably ten.  I don't know.

17      Q    Okay.  You mentioned one name, T. Pelie?

18      A    Yes.

19      Q    How do you spell that?  If you have any idea?

20      A    I don't remember.

21      Q    Okay.  So a number of you were being moved to the

22  crisis stabilization unit?  Yes?

23      A    Yes.

24      Q    And did you then request this meeting with

25  Ms. McVey and Mr. Warfield?

1      A    I did not request it.  They -- the union organized

2   meetings of every staff member ---

3      Q    Okay.

4      A    --- to discuss the moving, where they're going to

5   go after the unit of Jamaica Plain will close.

6      Q    Huh-huh.

7      A    I was actually the last one to meet with them.

8      Q    Okay.  Now the unit that you were in, what number

9   was that, again?

10     A    13C.

11     Q    13C?

12     A    Yes.

13     Q    The entire unit was being closed?

14     A    Yes.

15     Q    Okay.  So all the employees in 13C were being

16   moved?

17     A    Correct.

18     Q    Were all of you being moved to the crisis

19   stabilization unit?

20     A    No.

21     Q    Okay.  But ten of you were?

22     A    About ten.

23     Q    About ten.

24     A    I don't know.

25     Q    Okay.  And what job were you supposed to be

126

1    performing in the crisis stabilization unit?

2        A    Psychiatric nurse.

3        Q    Okay.  And so the meeting that's described in this

4    document, Exhibit 17, you said that was put together by the

5    union?

6        A    No.  This was put together by the mental health

7    nursing, Karen Bassett.

8        Q    Okay.  All right.  But you do meet ---

9            MR. KOWAL:  You said they arranged, the union

10   arranged meetings for everybody?

11           THE WITNESS:  Yes.

12           MR. KOWAL:  So this is your meeting?

13           THE WITNESS:  This is the decision that will ---

14           MR. KOWAL:  Not this, the decision.

15           THE WITNESS:  Right.

16           MR. KOWAL:  The meeting it describes?

17           THE WITNESS:  Right.  Right.

18           MR. KOWAL:  Was the meeting that ---

19           THE WITNESS:  Yes.

20           MR. KOWAL:  --- the union had set up?

21           THE WITNESS:  Correct.

22           MR. KOWAL:  Right?

23           THE WITNESS:  Right.

24           MR. WILMOT:  Okay.

25           MR. KOWAL:  I'm not saying this decision is right?

127

1              THE WITNESS:  Right.

2              MR. KOWAL:  I'm just saying that that was the

3    meeting?

4              THE WITNESS:  Yes.

5              MR. WILMOT:  Okay.

6              MR. KOWAL:  So let's get this consistent, so --

7    I'm sorry.  I'm just trying to help a little bit.

8              MR. WILMOT:  No, no.

9              MR. KOWAL:  So that's the same meeting that the

10   union had set up?

11             THE WITNESS:  Right.

12             MR. KOWAL:  The one described in here?

13             THE WITNESS:  Right.

14             MR. KOWAL:  I'm not saying you agreed with what's

15   written on there, but that's what was -- that was the

16   meeting?

17             THE WITNESS:  Yes.

18             MR. KOWAL:  Okay.

19       Q    BY MR. WILMOT:  Now, in this meeting with

20   Mr. Warfield and Ms. McVey, was there anyone else in the

21   meeting?

22       A    Mr. Warfield, Mrs. McVey, Karen Bassett.

23       Q    Okay.

24       A    And Lisa Cargill.

25       Q    Okay.  Now this memorandum at least purports to,

1    Q    Okay.

2    A    And that I have certain limitations that need to

3 be accommodated.

4    Q    Right.

5    A    And they decided that I would have to go to West

6 Roxbury unit and this will be documentation.

7    Q    I understand you didn't want to be transferred and

8 they told you you had to be transferred.

9    A    Right.

10   Q    My question is:  As to the accommodation that they

11 were going to give you, the accommodation here, as it

12 describes in this memo, is that you would not have to

13 respond to a Code Green.  Was that something you agreed to

14 in that meeting?

15   A    I -- I -- I -- they were aware I cannot respond

16 and they agreed to it in that meeting.

17   Q    So you did not agree to that?

18   A    I -- I -- I agree with that.  I couldn't respond

19 to a Code Green.  I could not do that physical ---

20   Q    Okay.

21   A    --- restraining patients.

22   Q    It says -- and it says here it was agreed that you

23 would provide all functions, except for responding to the

24 Code Green?

25   A    Right.

1    A    --- they were very vague.  I -- I disagreed.  I

2  went back to the union and I said, I don't want to be

3  transferred.

4    Q    Before -- before you move out of this meeting ---

5    A    Mm-hm.

6    Q    --- I'm trying to get from you exactly what was

7  told to you in terms of what accommodation you would

8  receive.  Do you remember what you were told in that

9  meeting?

10    A    In that meeting they told me I would not do

11  anything I cannot do.  This paper, although is dated June

12  28th, 2002, was given to me later; that the ---

13    MR. KOWAL:  Later than what?

14    THE WITNESS:  Later than the time when we already

15  moved to West Roxbury.

16    Q    BY MR. WILMOT:  Okay.  Well, again, in that

17  meeting, all they said -- you're telling me that what they

18  said to you, to allow you to perform your job, was that they

19  wouldn't make you do anything you cannot do?

20    A    Right.

21    Q    Okay.  And -- sorry, I'm kicking in the drawer.

22  Okay.

23    And you said in the room at that time was Lisa

24  Carhill -- Cargill ---

25    A    Cargill.

132

1        Q      --- and Karen Bassett, in addition to Mr. Warfield

2    and Ms. McVey?

3        A      Correct.

4        Q      Okay.  Following this meeting, you were then

5    transferred to West Roxbury?

6        A      Correct.

7        Q      Okay.  And at some point were you made to do

8    something that you could not do?

9        A      Yes.

10       Q      When did that first happen?

11       A      The first day I arrived there.

12       Q      And what day was that?

13       A      Oh, I can look through the medical records.  They

14   moved us, I think, July 2nd, July 1st, July 2nd, I think, or

15   July 1st, they moved us.

16       Q      Of 2002?

17       A      Yes.

18       Q      And what were you made to do on that first day

19   that you were not able to do?

20       A      To make walking rounds through the entire

21   hospital.

22       Q      Now correct me if I'm wrong, you weren't -- you

23   weren't unable to walk, right?

24       A      Right.

25       Q      You just were not able to walk excessively?

144

1     Q   BY MR. WILMOT:  Now the scooter, I guess, then

2  addressed your difficulty walking?

3     A   Yes.

4     Q   Okay.  Now, your other limitations you just

5  described as, you know, lifting, pulling, bending.  Did you

6  discuss any accommodation for those things?

7     A   Yes.  This is why I wasn't supposed to be involved

8  in any physical aspect of the care.

9     Q   Okay.  So the lifting, pulling and bending is

10  addressed by the June 28th, 2002, memo?

11     A   Yeah, they said ---

12     Q   Okay.

13     A   --- that they take care of.

14     Q   And that, what's the exhibit number on that memo,

15  again?

16     A   17.

17     Q   Okay.  Now, were you asked -- after this June

18  28th, 2002, memo, were you asked to do, to lift more than

19  you were able to lift?

20     A   Correct.

21     Q   And when did that occur?

22     A   After I got the scooter.

23     Q   Can you tell me when that happened?

24     A   After I returned to work with the scooter ---

25     Q   Huh-huh.

1    A    --- I was happy, that now I could do the rounds

2  and work with the patients.  They soon after, they started

3  to assign me, and I'm talking about days, not weeks.

4         MR. KOWAL:  Who is they?

5         THE WITNESS:  Mary Farren.

6    A    Assigned me to go to sit with patients as a

7  sitter.  And I went to the units to do this, and on the

8  units, medical units, I was asked by the staff on the

9  medical units to do physical care for patients that have

10  difficulty going to the bathroom, patients that were

11  confused, demented, had physical problem ambulating to the

12  bathroom, I was requested to do that.  And ---

13    Q    BY MR. WILMOT:  Did you actually perform those

14  duties?

15    A    No.

16    Q    You did not?  Okay.

17         So you refused to do those things?

18    A    I would put in danger the patient and myself.

19    Q    Okay.  So you did refuse to do it?

20    A    Yes.

21    Q    When you refused to do it, were you then

22  disciplined for not doing it?

23    A    Yes.

24    Q    So I want you to take me through that, if you

25  could, each time that that happened, that you were -- after

1    -- now, you have the scooter now, were you asked to do

2    something that you physically were unable to do, you refused

3    and then were disciplined for it?

4             MR. KOWAL:  She has a written memo of this that

5    we've given you of that whole sequence of events that she

6    wrote at the time.

7       Q    BY MR. WILMOT:  Well, if you want to give me a

8    thumbnail sketch for our deposition, that'd be helpful.

9       A    I have -- I wrote every single day what happened

10   ---

11       Q    Okay.

12       A    --- from the time I went back to work on November

13   4th, 2002, to the time I was asked to leave work,

14   December 19th.

15            MR. WILMOT:  And let's take a quick break so she

16   can change the tape.

17           (Off the record at 2:36 p.m. to 2:38 p.m.)

18       Q    BY MR. WILMOT:  My last question to you was:  If

19   you could tell me, after the time that you obtained the

20   scooter, when you were asked to do things you were

21   physically unable to do, and I guess refused, and then were

22   disciplined for that.  Can you tell me the first time after

23   the scooter?

24       A    All right.  So on November 4th, 2002, I returned

25   to work with the scooter.

1    Q    Huh-huh.

2    A    November 6th, I was working the midnight shift.  I

3  can read you the entire, the entire recollection that I

4  have.

5    Q    You don't have to read that entire thing.

6    A    Okay.

7    Q    But if you want to just ---

8    A    On November 6th, I was sent to sit with a patient

9  on a medical unit and required to physically restrain him in

10  case he will get agitated and pull out his IVs.  I told them

11  that I ---

12    Q    Hold on.  So someone asked you to physically

13  restrain a patient?

14        MR. KOWAL:  Just, she just said what she did.

15        MR. WILMOT:  Come -- Sandy, come on.  I'm giving

16  you guys a lot of leeway ---

17        MR. KOWAL:  Go ahead.

18        MR. WILMOT:  --- in this, and we're beyond -- you

19  know, we're crossing the line of being a little improper

20  now.

21    Q    BY MR. WILMOT:  Who asked you to restrain this

22  patient?

23    A    The nurse in charge on that medical unit.

24    Q    Do you remember who that was?

25    A    If I go through reading this, yes, but by my

1    memory, no.

2        Q    Is the nurse's name contained in that document

3    that you're looking at?

4        A    Yes.

5        Q    Are you able to locate what her name is?

6        A    Oh, I need to read this.

7             (Pause.)

8        A    I know that Arthur was the supervisor for the

9    entire nursing staff in the hospital, and I had to call

10   Arthur to help me explain the nurse in charge on that unit,

11   the unit was 4 North, that there are certain things I cannot

12   do.

13       Q    Okay.  So you don't remember what the nurse -- you

14   don't remember what the nurse's name of who asked you to

15   perform that, that function?

16       A    I think her name was Rosemary.

17       Q    Okay.  And so after Rosemary asked you to do this

18   and you expressed to Rosemary that you could not do it, you

19   contacted Arthur?

20       A    Yes.  It was more than this.  Yes.

21       Q    Okay.  Did Rosemary write, you know, give you a

22   warning or something or some type of written disciplinary

23   document?

24       A    Rosemary?  No.

25       Q    Were you disciplined for not restraining this

149

1    patient or ---

2         A    No.  Actually what Rosemary asked me to do, it

3    wasn't okay to do, and Arthur discontinued the one-to-one

4    with that patient ---

5         Q    Okay.

6         A    --- as not being necessary.

7         Q    Okay.  So you were asked to do something, you said

8    you weren't able to ---

9         A    Right.

10        Q    --- and you weren't made to do it?

11        A    Right.

12        Q    And you were not disciplined for it?

13        A    No.

14        Q    Okay.  Can you tell me about the times where you

15   were asked to do something, you refused to do it and then

16   you were disciplined?

17        A    Yes.

18        Q    Can you tell me those?

19        A    It was on December 19th, 2002.

20        Q    Okay.

21        A    I was sent ---

22             MR. KOWAL:  Speak up a little, please, will you?

23        A    I was sent to sit with a patient that was confused

24   and agitated and combative and at risk to pull out his IV

25   lines, and I was asked to prevent him from pulling out his

164

1  it.

2          THE WITNESS:  Yes.

3          (Off the record at 3:00 p.m. to 3:01 p.m.)

4      Q    BY MR. WILMOT:  So when you returned back to work

5  on December 30th, 2002, did you meet with your supervisors?

6      A    I -- I was called to meet with Sissy McVey at 11

7  a.m.  They met before me, but I wasn't allowed in the

8  meeting, the same as on December 20th, I wasn't allowed in

9  the meeting, again.  They met without me.

10     Q    Okay.

11     A    And I was called at 11 a.m. and told by Sissy

12  McVey that I need to return home with pay until they will

13  decide what to do with me.

14     Q    Okay.  So when did you hear from the VA, again,

15  after December 30th, 2002?

16     A    April 7, 2003.

17     Q    So you were out of -- you were not at work from

18  December 30th, 2002, to April 7th, 2003?  Were you out with

19  pay?

20     A    I was out with pay.

21     Q    Okay.  Did your benefits change at all during that

22  time?

23     A    I was getting straight pay.  I wouldn't get any

24  differential for -- shift differential or weekend

25  differential.  As a nurse, you get differential pay for

165

1   evenings and weekends.

2       Q    Okay.  Did your benefits change at all during that

3   period that you were on leave with pay?

4       A    No.

5       Q    Okay.

6       A    Not to my knowledge.  I don't know what benefits

7   you are talking about.

8       Q    Medical benefits?

9       A    I don't think so.

10      Q    Were you still allowed to accrue vacation time,

11  sick time?

12      A    I suppose so.  I never checked.

13      Q    Okay.

14      A    I never did that.

15      Q    And when you returned on April 7th, 2003, where

16  did you return to?

17      A    To the TAP line.

18      Q    The TAP line?  Can you describe what that is?

19      A    Telephone advisory program of the primary care at

20  JP.  It -- it serves the entire Division 1.  That means it

21  serves patients that are -- patients at the VA in Jamaica

22  Plain, West Roxbury, Causeway Street and Brockton.

23      Q    Mm-hm.

24      A    Primary care patients.  And it basically is a

25  service used to communicate between patient, pharmacy and

166

1    primary care provider.  I was supposed to do triage nursing.

2         Q    Okay.  And you still perform that duty today?

3         A    Yes.

4         Q    Okay.  But this position doesn't include any type

5    of psychiatric nursing, correct?

6         A    Correct.

7         Q    Okay.  All right.  Now the crisis stabilization

8    unit that you left in December 2002, does that unit still

9    exist?

10        A    No.  It was closed.

11        Q    When was it closed?

12        A    This year, in June, I suppose, or July.

13        Q    Now the TAP unit, is that what it's called?

14        A    TAP line.

15        Q    The TAP line, where is that located?

16        A    In Jamaica Plain, in some offices without a label.

17        Q    Okay.

18        A    I suppose ---

19             MR. KOWAL:  I can't hear a word you're saying,

20   ma'am.  I'm sorry.

21        A    In Jamaica Plain.

22        Q    BY MR. WILMOT:  Mm-hm.  Okay.

23        A    We work on the computers and telephone.

24        Q    Okay.  Now in this position, are you made to walk

25   at all?

1     A   No.

2     Q   Do you have to lift or bend or carry anything?

3     A   No.

4     Q   Okay.  Has it been a physical burden at all

5 working in the TAP?

6     A   Not for two years.

7     Q   Okay.

8     A   I had some problems from repetitive stress injury

9 to my neck in January this year, and I got some ergonomics

10 to rearrange my desk.  I went into physical therapy, pain

11 clinic and acupuncture and seems to get better.

12     Q   Okay.  But while you've been working in TAP, you

13 haven't been made to perform a function that you already

14 told the VA you were physically unable to do, correct?

15     A   Correct.

16     Q   Okay.  Now you mentioned that you're on medication

17 now; is that correct?

18     A   Yes.

19     Q   What medication are you on now?

20     A   I'm taking Celebrex for my arthritis, and I take

21 Tramadol for my neck pain.

22          THE COURT REPORTER:  Could you ---

23          THE WITNESS:  Tramadol.

24     Q   BY MR. WILMOT:  How long have you been taking

25 Celebrex?

168

1      A     Oh, I'm taking Celebrex for a few years.   2001,

2    2002 ---

3            MR. KOWAL:  I can't hear you.

4      A     2001 or 2002, something.

5      Q     BY MR. WILMOT:  Okay.  As a side note, you should

6    probably find something different from Celebrex, right?

7      A     I tried.  I went off Celebrex for a while because

8    I panicked and I couldn't walk any more.

9      Q     Yeah.

10     A     This is when I got the cane to help me, but I have

11   to be on Celebrex ---

12     Q     Yeah.

13     A     --- otherwise I can't walk.

14     Q     Prior to Celebrex, was there a different

15   medication that you were on?

16     A     No.   They tried me on Motrin, but I cannot

17   tolerate it.

18     Q     Upsets your stomach?

19     A     Even Celebrex, I take tonics to be able to

20   tolerate Celebrex.

21     Q     Mm-hm.  Okay.  And I know there was a period of

22   time that you were suffering from -- I'm probably going to

23   pronounce it wrong, but bursitis?

24            MR. KOWAL:  Bursitis.

25     A     Bursitis.

1    Roxbury?

2        Q    Right.   It seems like you've had a couple of moves

3    ---

4        A    Right.

5        Q    --- since November 1998.   Has your pay decreased

6    at all?

7        A    No, not the basic pay.   No.

8        Q    Okay.

9        A    I just -- when I stopped working in psychiatry and

10   I didn't do the shifts, I didn't get the differential pay,

11   but the basic pay remained the same.

12       Q    Now, you're in TAP.   Now, for example, are you

13   still getting paid as if you were a psychiatric nurse?

14       A    I -- I get paid as an RN, yes.

15       Q    Okay.   And the things you just identified for me,

16   we've spoke already today, right?

17       A    Mm-hm.

18       Q    Yes?

19       A    Yes.

20       Q    While at the VA, have you ever been the recipient

21   of any insulting comments concerning your physical

22   condition?

23       A    At the VA?

24       Q    Yeah.

25       A    Yes.

183

1    Q    Did you apply to this posting, the one that I just

2  gave you marked as Exhibit 21?

3    A    I'm looking through my e-mails ---

4    Q    Sure.

5    A    --- to see if I applied to this.

6         MR. KOWAL:  It was posted twice.  Same job.

7         (Pause.)

8    A    I -- I don't have any ---

9    Q    BY MR. WILMOT:  Okay.

10   A    --- anything to recollect that.

11                    (Enica Deposition Exhibit 22

12                    marked.)

13   Q    BY MR. WILMOT:  Well, let me -- maybe this will

14 help you.  Let me show you what's marked as Exhibit 22.  Can

15 you identify what that document is?

16   A    Certificate for the position of nurse

17 practitioner, Mental Health Service Line, Boston Campus.

18 The candidates listed below are eligible for accept --

19 accepted -- they are referred to for consideration and

20 provided by our promotion policy.  And there are some names,

21 Ann Marie Kramer, Lisa Hamilton, Peggy Welland, Caroline

22 Mahoney, Artil MacIntosh, Sola Schekel, Leslie Sullivan.

23   Q    Now would you agree with me that the document I

24 just gave you shows a list of the persons who applied to the

25 February 2003 posting of this nurse practitioner posting?

184

1   A   It may.

2   Q   But your name is not on that ---

3   A   No.

4   Q   --- that list there, right?

5   A   No.

6   Q   Does that refresh your memory that you did not

7   apply for at least the February 2003 posting?

8   A   Probably not.

9   Q   Okay.

10                    (Enica Deposition Exhibit 23

11                    marked.)

12   Q   BY MR. WILMOT:  Let me show you what's been marked

13   as Exhibit 23.  Do you recognize that document?

14   A   Yes.  This is the one that I have.

15   Q   Can you identify what that document is?

16       THE COURT REPORTER:  Please read loud.

17   A   The Mental Health Service Jamaica Plain Division

18   ---

19       MR. KOWAL:  Well, just ---

20   Q   BY MR. WILMOT:  Just identify what it is.

21   A   Oh, oh.  It's a -- it's a reassignment

22   opportunity, a vacancy announcement.

23   Q   Okay.  And what's the date on that document?

24   A   June 5th, 2003.

25   Q   Now this is the posting that you did apply for,

189

1    to him?

2        A    The one that I tried to do by -- with the -- with

3    the help of the union and everything.

4            MR. KOWAL:  What time?

5        Q    BY MR. WILMOT:  What's the date of that e-mail?

6        A    The date on this was June 2nd, 2002.

7        Q    Okay.

8        A    No, 21st of -- no, June 2nd.

9            MR. KOWAL:  June 21st.

10       A    June 21st, 2002.

11       Q    BY MR. WILMOT:  Okay.  And during any of the times

12   that you spoke with members of management at the VA as to

13   providing you accommodation, did you ever speak with

14   Dr. McCarley?

15       A    Not that I recall.  I didn't speak personally.  I

16   just send him ---

17       Q    I understand that.

18       A    Yes.

19       Q    Just answer -- my question was:  Did you ever

20   speak with Dr. McCarley about providing you an

21   accommodation?

22       A    Not directly, no.

23       Q    Was he ever in any of the meetings that were held

24   concerning, you know, providing you an accommodation?

25       A    No.

1      Q    Now at some point you did file a second complaint

2   of employment discrimination with the EEOC, correct?

3      A    Yes.

4           MR. KOWAL:  I filed it for her.

5      A    Yes.

6      Q    BY MR. WILMOT:  When I say, you, I mean you or

7   your representative.

8      A    Okay.  Yes.

9      Q    Yes?

10     A    Yes.

11     Q    Okay.

12          MR. WILMOT:  Let's mark that then.

13          THE COURT REPORTER:   That's 28.

14                         (Enica Deposition Exhibit 28

15                         marked.)

16          MR. WILMOT:  We're almost done.

17          MR. KOWAL:  Good.  We got to get out of here.

18   We'll never get out of that parking lot.

19          MR. WILMOT:  Oh, you'll be fine.  That's what you

20   get paid the big bucks for.

21          (Laughter.)

22     Q    BY MR. WILMOT:  Exhibit 28, do you recognize that

23   document?

24     A    Yes.

25     Q    Can you identify just what it is?

1        Q    BY MR. WILMOT:   Okay.

2        A    And I was telling Karen, I cannot walk, Karen.   I

3    need to stay.   I say, you go and visit that floor.   I cannot

4    do it.   I'll stay by the elevator and we'll go some -- and I

5    wait for you.   And they will not let me wait for them.   So

6    the first day I had to do it.   We finished the orientation

7    and after the orientation our duty was supposed to be to

8    take care of patients in the stabilization unit.   It just

9    happened that we did not have patients there.

10       Q    Mm-hm.

11       A    Maybe we had one or two per week and they will

12   stay for 23 hours maximum.   So our other duties included to

13   go to psychiatric rounds in that hospital.   There is a

14   psychiatrist there.

15       Q    Mm-hm.

16       A    And he runs an inpatient psychiatric service that

17   provides psychiatric services to the patients on medical

18   units.   So his rounds were, we had to go through the entire

19   hospital to visit all the psych patients on those medical

20   units.

21           MR. KOWAL:   With him?

22           THE WITNESS:   With him twice a week, without him

23   every day we will get assignment to go and do counseling

24   with different patients on medical units, the patients that

25   have psychiatric problems.

1      A    Because I had problems with walking.

2      Q    Right.  But you've always had that problem with

3 the walking.  Why did you get the note at this time?  Was

4 there something going on that made you go and get this note?

5      A    Yes.

6      Q    What was that?

7      A    The walking was much more than on the previous, on

8 the previous unit.

9      Q    Right.  But you had been there now since July of

10 2002.  This is October 2002.

11      A    Yes.  Because it aggravated my disability.

12      Q    Okay.

13      A    I was in severe pain and I had ---

14      Q    So the pain was -- the pain was getting worse ---

15      A    Very.

16      Q    --- so you went back to your doctor.  And who did

17 you give this note to?

18      A    I probably gave it to Mary Farren and Karen

19 Bassett, the employees health.

20      Q    Okay.  Now did that cause them to speak with you

21 again about coming up with some way of accommodating you?

22      A    I -- at that time I, you know, I was -- I felt I

23 exhausted my ability to be effective in obtaining help, so I

24 hired Mr. Kowal.

25      Q    Okay.