# Exhibit B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LUCIA ENICA,                        )
                                    )
        Plaintiff,                  )
                                    )
        v.                          )        Docket No. 04cv11468-DPW
                                    )
ANTHONY J. PRINCIPI, as he is       )
secretary of Veterans Affairs       )
of the Department of                )
Veterans Affairs,                   )
                                    )
        Defendant.                  )
                                    )

## AFFIDAVIT OF CECILIA MCVEY

I, Cecilia McVey, hereby state as follows:

1.  I am over the age of 18, and am mentally competent to
    testify as to the matters contained in this affidavit.

2.  The information contained in this affidavit is based
    upon my personal knowledge.

3.  I make this affidavit knowingly and voluntarily.

4.  For the last 37 years, I have worked for the Veteran
    Affairs' ("VA") Boston Healthcare system, which
    includes three major medical centers: Jamaica Plain,
    West Roxbury, and Brockton, as well as several
    outpatient clinics. My official title is Associate
    Director of Nursing and Patient Care.

5.  In 1994, the VA hired Plaintiff, Lucia Enica, as a
    Registered Nurse at the Jamaica Plain campus. Her job
    functions included all aspects of basic care for
    patients with physical and emotional problems.

6.  In 1995, when the VA was closing her unit, Ms. Enica
    for the first time informed management that she had
    physical limitations. Ms. Enica told management that
    she would not be able to work in another unit besides
    psychiatry because of her physical deficits. The VA,
    therefore, transferred Ms. Enica to another psychiatric
    unit within the Jamaica Plain campus.

7.  In 1996, Ms. Enica told management that she could not

take a patient on a stretcher to electric compulsive
shock therapy because she was in pain. Ms. Enica's
supervisor asked her to submit a doctor's note with her
limitations and restrictions.

8. Ms. Enica provided the VA with a note by Dr. Richard
Wright, stating that Ms. Enica should avoid repetitive
low back activity and repetitive heavy pushing or
pulling. Ms. Enica's supervisor asked her to undergo a
fitness for duty exam by Dr. John Harris, Chief of
Orthopedic Surgeons at the VA, to evaluate whether Ms.
Enica was capable of performing the essential functions
of a staff nurse at the VA hospital. Dr. Harris stated
that Ms. Enica could neither carry or push 45 pounds.
Accordingly, the VA modified Ms. Enica's job functions
by excusing her from carrying or pushing more than 45
pounds.

9. In 2000, the VA decided to integrate all *inpatient* patient care
service at the Jamaica Plain campus with the West
Roxbury and Brockton campuses. In 2001 and 2002, the
VA negotiated with the labor union to transfer the
employees from Jamaica Plain to either of the other two
campuses.

10. In 2002, when Ms. Enica learned that the VA was closing
her unit, she immediately became concerned about where
the VA would transfer her. Ms. Enica expressed her
desire to stay at the Jamaica Plan campus in a position
in mental health; however, there were no such positions
available.

11. In June 2002, Ms. Enica met with William Warfield,
Chief of Employee Relations in Human Resources, Lisa
Cargill and me concerning the closing of her unit at
the Jamaica Plain VA. In this meeting, Mr. Warfield
and I told Ms. Enica that the VA was transferring her,
as well as ten other nurses, to its crisis
stabilization unit in West Roxbury. Because this
entirely new unit had only three beds, we anticipated
that the work would be physically less demanding than
Ms. Enica's current position at the Jamaica Plain
campus. We also discussed Ms. Enica's request for
additional accommodations of her physical limitations.
We all agreed that Ms. Enica did not have to respond to
any physical aspects of a crisis intervention, such as
a "Code Green."

2

12.  In September 2002, Ms. Enica reported to her
     supervisors in the West Roxbury hospital that she was
     experiencing leg and back pain and could not perform
     her walking rounds.

13.  Ms. Enica asked the VA to transfer her to an outpatient
     unit, but no such position was available.

14.  Because Ms. Enica claimed that she could not perform an
     essential function of her job, her supervisor, Karen
     Basset, asked Ms. Enica to provide the VA with updated
     medical documentation from her physician detailing her
     current physical limitations and restrictions.

15.  Further, because Ms. Enica was complaining of extreme
     pain, the VA placed Ms. Enica on paid administrative
     leave, which allowed Ms. Enica to obtain the updated
     medical documentation and ensured her safety while she
     and the VA discussed her impairments and what, if any,
     accommodations would allow her to perform her job.

16.  On or about October 2, 2002, Ms. Enica provided the VA
     with an updated medical noted from Dr. Provost.  Dr.
     Provost's note stated that Ms. Enica recently developed
     pain in her hip and recommended that the VA transfer
     Ms. Enica to outpatient facility that would eliminate
     the stress to the arthritic changes in her right lower
     extremity.

17.  The VA, however, did not have such a position
     available, and, therefore, discussed with Ms. Enica's
     counsel alternative accommodations.  After discussing
     Ms. Enica's walking restrictions with her counsel, the
     VA, with Ms. Enica's counsel's approval, provided Ms.
     Enica with an electric scooter on November 4, 2002,
     when Ms. Enica returned to work.

18.  After Ms. Enica returned to work on November 4, 2002,
     Ms. Enica began objecting to performing certain
     assignments.  Her supervisors did not require her to
     complete the tasks, nor did they discipline her for
     refusing to perform them.

19.  However, because Ms. Enica was asserting additional
     physical limitations that she had not discussed with
     the VA, on December 30, 2002, the VA, in the best
     interests of Ms. Enica and its psychiatric patients,
     placed Ms. Enica on paid administrative leave pending

3

the receipt of updated medical documentation on the
entire scope of Ms. Enica's restrictions and
limitations.  Ms. Enica remained on administrative
leave, with full pay and benefits, until April 7, 2003.

Signed this 31th day of January, 2006, under the pains and
penalties of perjury.

_____

Cecilia McVey

4

# Exhibit C

(2440)

## UNITED STATES CIVIL SERVICE COMMISSION
## CERTIFICATE OF MEDICAL EXAMINATION

TO BE GIVEN TO PERSON EXAMINED WITH A PRE-ADDRESSED "CONFIDEN-TIAL-MEDICAL" ENVELOPE.

Form Approved
Budget Bureau
No. 50–R0073

### Part A. TO BE COMPLETED BY APPLICANT OR EMPLOYEE (typewrite or print in ink)

**1. NAME (last, first, middle)**
Enica Lucia

**2. SOCIAL SECURITY ACCOUNT NO.**

**3. SEX**
☐ MALE
☐ FEMALE

**4. DATE OF BIRTH**

**5. DO YOU HAVE ANY MEDICAL DISORDER OR PHYSICAL IMPAIRMENT WHICH WOULD INTERFERE IN ANY WAY WITH THE FULL PERFORMANCE OF THE DUTIES SHOWN BELOW?**
☐ YES  ☐ NO

(If your answer is YES explain fully to the physician performing the examination)

**6. I CERTIFY THAT ALL THE INFORMATION GIVEN BY ME IN CONNECTION WITH THIS EXAMINATION IS CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF**

Lucia Enica
(signature of applicant)

### Part B. TO BE COMPLETED BEFORE EXAMINATION BY APPOINTING OFFICER

**1. PURPOSE OF EXAMINATION**
☑ PREAPPOINTMENT
☐ OTHER (specify)

**2. POSITION TITLE**
RN

**3. BRIEF DESCRIPTION OF WHAT POSITION REQUIRES EMPLOYEE TO DO**

4. Circle the number preceding *each* functional requirement and *each* environmental factor essential to the duties of this position. List any additional essential factors in the blank spaces. Also, if the position involves law enforcement, air traffic control, or fire fighting, attach the specific medical standards for the information of the examining physician.

### A. FUNCTIONAL REQUIREMENTS

1. Heavy lifting, 45 pounds and over
2. Moderate lifting, 15–44 pounds
3. Light lifting, under 15 pounds
4. Heavy carrying, 45 pounds and over
5. Moderate carrying, 15–44 pounds
6. Light carrying, under 15 pounds
7. Straight pulling (   hours)
8. Pulling hand over hand (   hours)
9. Pushing (   hours)
10. Reaching above shoulder
11. Use of fingers
12. Both hands required
13. Walking (   hours)
14. Standing (   hours)
15. Crawling (   hours)
16. Kneeling (   hours)
17. Repeated bending (   hours)
18. Climbing, legs only (   hours)
19. Climbing, use of legs and arms
20. Both legs required
21. Operation of crane, truck, tractor, or motor vehicle
22. Ability for rapid mental and muscular coordination simultaneously
23. Ability to use and desirability of using firearms
24. Near vision correctable at 13" to 16" to Jaeger 1 to 4
25. Far vision correctable in one eye to 20/20 and to 20/40 in the other
26. Far vision correctable in one eye to 20/50 and to 20/100 in the other
27. Specific visual requirement (specify)
28. Both eyes required
29. Depth perception
30. Ability to distinguish basic colors
31. Ability to distinguish shades of colors
32. Hearing (aid permitted)
33. Hearing without aid
34. Specific hearing requirements (specify)
35. Other (specify)

### B. ENVIRONMENTAL FACTORS

1. Outside
2. Outside and inside
3. Excessive heat
4. Excessive cold
5. Excessive humidity
6. Excessive dampness or chilling
7. Dry atmospheric conditions
8. Excessive noise, intermittent
9. Constant noise
10. Dust
11. Silica, asbestos, etc.
12. Fumes, smoke, or gases
13. Solvents (degreasing agents)
14. Grease and oils
15. Radiant energy
16. Electrical energy
17. Slippery or uneven walking surfaces
18. Working around machinery with moving parts
19. Working around moving objects or vehicles
20. Working on ladders or scaffolding
21. Working below ground
22. Unusual fatigue factors (specify)
23. Working with hands in water
24. Explosives
25. Vibration
26. Working closely with others
27. Working alone
28. Protracted or irregular hours of work
29. Other (specify)

### Part C. TO BE COMPLETED BY EXAMINING PHYSICIAN

**1. EXAMINING PHYSICIAN'S NAME (type or print)**

**2. ADDRESS (including ZIP Code)**

**3. SIGNATURE OF EXAMINING PHYSICIAN**

(signature)    JUN 17 1994 (date)

IMPORTANT: After signing, return *the entire form intact* in the pre-addressed "Confidential-Medical" envelope which the person you examined gave you.

78-110

STANDARD FORM NO. 78
OCTOBER 1969 (REVISION)
CIVIL SERVICE COMMISSION
FPM 339

NOTE TO EXAMINING PHYSICIAN: The person you are about to examine will have to cope with the functional requirements and environmental factors circled on the other side of this form. Please take them, and the brief description of job duties above them, into consideration as you make your examination and report your findings and conclusions.

1. HEIGHT: __5__ FEET, __5__ INCHES.                    WEIGHT: _140_ POUNDS.

2. EYES:
   (A) Distant vision (Snellen): without glasses: right $\frac{20}{20}$ left $\frac{20}{20}$; with glasses, if worn: right $\frac{20}{}$ left $\frac{20}{}$
   (B) What is the longest and shortest distance at which the following specimen of Jaeger No. 2 type can be read by the applicant? Test each eye separately.

   | — Jaeger No. 2 Type — | without glasses: | with glasses, if used: |
   |---|---|---|
   | employees in the Federal classified service as may be requested by the Civil Service Commission or its authorized representative. This order will supplement the Executive Orders of May 29 and June 18, 1923 (Executive Order, September 4, 1924). | R. _____ in. to _____ in.   L. _____ in. to _____ in. | R. _____ in. to _____ in.   L. _____ in. to _____ in. |

   (C) Color vision: Is color vision normal when Ishihara or other color plate test is used? [X] YES [ ] NO
   If not, can applicant pass lantern, yarn, or other comparable test? [ ] YES [ ] NO

3. EARS: (Consider denominators indicated here as normal. Record as numerators the greatest distance heard.)
   Ordinary conversation:
   RIGHT EAR _____; LEFT EAR _____
   20 h.          20 h.

   Audiometer (if given):

   | 250 | 500 | 1000 | 2000 | 3000 | 4000 | 5000 | 6000 | 7000 | 8000 |
   |---|---|---|---|---|---|---|---|---|---|
   | | | | | | | | | | |

4. OTHER FINDINGS: In items a through l briefly describe any abnormality (including diseases, scars, and disfigurations). Include brief history, if pertinent. If normal, so indicate.

   a. Eyes, ears, nose, and throat (including tooth and oral hygiene)   NL
   b. Head and back (including face, hair, and scalp)   NL
   c. Speech (note any malfunction)   NL
   d. Skin and lymph nodes (including thyroid gland)   NL

   e. Abdomen   NL
   f. Peripheral blood vessels   NL
   g. Extremities   NL
   h. Urinalysis (if indicated)
      Sp. gr. _____   Sugar _____   Blood _____
      Albumen _____   Casts _____   Pus _____

   i. Respiratory tract (X-ray if indicated)   Clear to A'l

   j. Heart (size, rate, rhythm, function)
      Blood pressure 100/50
      Pulse 68
      EKG (if indicated)   NR S₁S₂ ⑤

   k. Back (special consideration for positions involving heavy lifting and other strenuous duties)   Full Rom s̄ pain or discomfort ∅ scoliosis

   l. Neurological and mental health   NL

CONCLUSIONS: Summarize below any medical findings which, in your opinion, would limit this person's performance of the job duties and/or would make him a hazard to himself or others. If none, so indicate.
   [X] No limiting conditions for this job
   [ ] Limiting conditions as follows:

2 of 20

STANDARD FORM 93
REV. OCTOBER 1974
FIRMR (41 CFR) 201-45.505

APPROVED
OFFICE OF MANAGEMENT AND BUDGET No. 29- R0191

# REPORT OF MEDICAL HISTORY

**(THIS INFORMATION IS FOR OFFICIAL AND MEDICALLY-CONFIDENTIAL USE ONLY AND WILL NOT BE RELEASED TO UNAUTHORIZED PERSONS)**

| 1. LAST NAME—FIRST NAME—MIDDLE NAME | 2. SOCIAL SECURITY |
|---|---|
| *Erica, Lucia* | (redacted) |

| 3. HOME ADDRESS (No. street or RFD, city or town, State, and ZIP CODE) | 4. POSITION (title, grade, component) |
|---|---|
| *80 BRADFORD Rd. Apt. 1 WATERTOWN, MA 02172* | *RN* |

| 5. PURPOSE OF EXAMINATION | 6. DATE OF EXAMINATION | 7. EXAMINING FACILITY OR EXAMINER, AND ADDRESS (include ZIP Code) |
|---|---|---|
| *Pre-employment* | *6/17/94* | *Boston, MA* |

8. STATEMENT OF EXAMINEE'S PRESENT HEALTH AND MEDICATIONS CURRENTLY USED (Follow by description of past history, if complaint exists)

**9. HAVE YOU EVER (Please check each item)**

| YES | NO | (Check each item) |
|---|---|---|
| | ✓ | Lived with anyone who had tuberculosis |
| | ✓ | Coughed up blood |
| | ✓ | Bled excessively after injury or tooth extraction |
| | ✓ | Attempted suicide |
| | ✓ | Been a sleepwalker |

**10. DO YOU (Please check each item)**

| YES | NO | (Check each item) |
|---|---|---|
| | ✓ | Wear glasses or contact lenses |
| ✓ | | Have vision in both eyes |
| | ✓ | Wear a hearing aid |
| | ✓ | Stutter or stammer habitually |
| | ✓ | Wear a brace or back support |

**11. HAVE YOU EVER HAD OR HAVE YOU NOW (Please check at left of each item)**

| YES | NO | DON'T KNOW | (Check each item) | YES | NO | DON'T KNOW | (Check each item) | YES | NO | DON'T KNOW | (Check each item) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ✓ | | | Scarlet fever, erysipelas | | ✓ | | Cramps in your legs | | ✓ | | "Trick" or locked knee |
| | ✓ | | Rheumatic fever | | ✓ | | Frequent indigestion | | ✓ | | Foot trouble |
| | ✓ | | Swollen or painful joints | ✗ | ✓ | | Stomach, liver, or intestinal trouble | | ✓ | | Neuritis |
| ✓ | | | Frequent or severe headache | | | | Gall bladder trouble or gallstones | ✓ | ✓ | | Paralysis (include infantile) |
| ✓ | | | Dizziness or fainting spells | ✓ | ✓ | | Jaundice or hepatitis | | ✓ | | Epilepsy or fits |
| ✓ | | | Eye trouble | | | | Adverse reaction to serum, drug, | ✓ | ✓ | | Car, train, sea or air sickness |
| ✓ | | | Ear, nose, or throat trouble | | ✓ | | or medicine | | ✓ | | Frequent trouble sleeping |
| ✓ | | | Hearing loss | ✓ | | | Broken bones | | ✓ | | Depression or excessive worry |
| ✓ | | | Chronic or frequent colds | | ✓ | | Tumor, growth, cyst, cancer | ✓ | | | Loss of memory or amnesia |
| ✓ | | | Severe tooth or gum trouble | | ✓ | | Rupture/hernia | | ✓ | | Nervous trouble of any sort |
| ✓ | | | Sinusitis | | ✓ | | Piles or rectal disease | ✓ | | | Periods of unconsciousness |
| ✓ | | | Hay Fever | | ✓ | | Frequent or painful urination | | | | |
| ✓ | | | Head injury | | ✓ | | Bed wetting since age 12 | | | | |
| ✓ | | | Skin diseases | | ✓ | | Kidney stone or blood in urine | | | | |
| ✓ | | | Thyroid trouble | | ✓ | | Sugar or albumin in urine | | | | |
| ✓ | | | Tuberculosis | | ✓ | | VD—Syphilis, gonorrhea, etc. | | | | |
| ✓ | | | Asthma | | ✓ | | Recent gain or loss of weight | | | | |
| ✓ | | | Shortness of breath | | ✓ | | Arthritis, Rheumatism, or Bursitis | | | | |
| ✓ | | | Pain or pressure in chest | | ✓ | | Bone, joint or other deformity | | | | |
| ✓ | | | Chronic cough | | ✓ | | Lameness | | | | |
| ✓ | | | Palpitation or pounding heart | | ✓ | | Loss of finger or toe | **12. FEMALES ONLY: HAVE YOU EVER** | | | |
| ✓ | | | Heart trouble | | ✓ | | Painful or "trick" shoulder or elbow | ✓ | | | Been treated for a female disorder |
| ✓ | | | High or low blood pressure | | ✓ | | Recurrent back pain | ✓ | | | Had a change in menstrual pattern |

| 13. WHAT IS YOUR USUAL OCCUPATION? | 14. ARE YOU (Check one) |
|---|---|
| | ✓ Right handed    ☐ Left handed |

*3 of 20*

93-107

| YES | NO | CHECK EACH ITEM YES OR NO. EVERY ITEM CHECKED YES MUST BE FULLY EXPLAINED IN BLANK SPACE ON RIGHT | |
|---|---|---|---|
| ✓ | | 15. Have you been refused employment or been unable to hold a job or stay in school because of: A. Sensitivity to chemicals, dust, sunlight, etc. | |
| | ✓ | B. Inability to perform certain motions. | |
| | ✓ | C. Inability to assume certain positions. | |
| | ✓ | D. Other medical reasons (If yes, give reasons.) | |
| | ✓ | 16. Have you ever been treated for a mental condition? (If yes, specify when, where, and give details.) | |
| | ✓ | 17. Have you ever been denied life insurance? (If yes, state reason and give details.) | |
| ✓ | | 18. Have you had, or have you been advised to have, any operations? (If yes, describe and give age at which occurred.) | → Internal Fixation i Opened Reduction of Fracture Age 20 & 12 Apendectomy age 28. |
| ✓ | | 19. Have you ever been a patient in any type of hospitals? (If yes, specify when, where, why, and name of doctor and complete address of hospital.) | In Remenia for the above Fracture Sugery In West Germany for Apendectomy. |
| | ✓ | 20. Have you ever had any illness or injury other than those already noted? (If yes, specify when, where, and give details.) | |
| | ✓ | 21. Have you consulted or been treated by clinics, physicians, healers, or other practitioners within the past 5 years for other than minor illnesses? (If yes, give complete address of doctor, hospital, clinic, and details.) | |
| | ✓ | 22. Have you ever been rejected for military service because of physical, mental, or other reasons? (If yes, give date and reason for rejection.) | |
| | ✓ | 23. Have you ever been discharged from military service because of physical, mental, or other reasons? (If yes, give date, reason, and type of discharge: whether honorable, other than honorable, for unfitness or unsuitability.) | |
| | ✓ | 24. Have you ever received, is there pending, or have you applied for pension or compensation for existing disability? (If yes, specify what kind, granted by whom, and what amount, when, why.) | |

I certify that I have reviewed the foregoing information supplied by me and that it is true and complete to the best of my knowledge.
I authorize any of the doctors, hospitals, or clinics mentioned above to furnish the Government a complete transcript of my medical record for purposes of processing my application for this employment or service.

| TYPED OR PRINTED NAME OF EXAMINEE | SIGNATURE |
|---|---|
| LUCIA   ENICA | Lucia Enica |

NOTE: HAND TO THE DOCTOR OR NURSE, OR IF MAILED MARK ENVELOPE "TO BE OPENED BY MEDICAL OFFICER ONLY."
25. Physician's summary and elaboration of all pertinent data (Physician shall comment on all positive answers in items 9 through 24. Physician may develop by interview any additional medical history he deems important, and record any significant findings here.)

PPD .1 ml RT
FOREARM

Hx of Hepatitis B

Hx of Primary Varicella Infection

PPD .1 ml RT
FOREARM

AUG - 8 1994

| OR PRINTED NAME OF PHYSICIAN OR EXAMINER DENNI ACCORDANCE MD WITH BOSTON MA | DATE JUN 17 1994 | SIGNATURE | NUMBER OF ATTACHED SHEETS |
|---|---|---|---|

*U.S. Government Printing Office: 1992 — 312-071/50167

4 of 20

# Exhibit D

## Department of Veterans Affairs

# Memorandum

Date: July 8, 1996

From: Chief, Human Resources Management Service (05)

Subj: Fitness for Duty Exam

To: Lucia Enica, RN
THRU:  Carol F. Coulter, RN, AMCD (118)

1.  This is to notify you that you are scheduled for a fitness for duty physical examination on Thursday, July 25, 1996 at 9:00 am.

2.  The exam will be performed by John McA. Harris, III, M.D., Chief, Orthopedic Section for the purpose of determining whether you are physically capable of performing the essential functions of a staff nurse at this medical center.

3.  Please report to the Employee Health office, Room E1-90 promptly at 9:00 am.  You may bring medical reports, the results of diagnostic tests, or any other relevant information you wish Dr. Harris to consider.

4.  If you have any questions, regarding this exam, you may contact the Human Resources Management Service at extension 5545.

ROBERT A. BASS



PG 1 OF 3

VA FORM
MAR 1989 **2105**

# Exhibit E

| **MEDICAL RECORD** | | PROGRESS NOTES |

7/25/96   EMPLOYEE HEALTH ORTHOPEDIC NOTE:

PROBLEM:   Fitness for duty.

SUBJECTIVE:   Ms. Enica is a registered nurse who was born in Rumania on 12/14/52. At the age of 10 months, after she had begun to walk, she developed polio which affected her right leg. She was unable to walk without the benefit of braces, thereafter, for several years. At about the age of 12, she was pushed and fell on her right leg suffering an oblique mid-diaphyseal fracture, which was casted and had cerclage wires applied. She ended this episode with a union that was about 4 cm. shorter than her left femur. At the end of high school, at about the age of 19, a "famous" orthopedic surgeon did an osteotomy in "Z" which ended with a sciatic nerve stretch injury. This may in part have been because she has an AB (negative) blood type and the hospital where this surgeon was working ran out of blood to replace the blood that she was losing. She was, therefore, replaced with plasma and this led to a Hepatitis B episode. The wound was also infected and she was hospitalized for more than a year. About three years after this episode, she was able to start walking, although it was very painful and took her two additional years to learn to walk (a total of 4 years). All of this occurred in Rumania.

7/29/46

In 1981, she emigrated to Germany and 9 months later to the U.S. in 1982. In New York, she went to NYU and got a BSN in nursing some time in the mid-1980's. She worked at NYU Medical Center s/p graduation but her back, leg, and ankle all hurt and, after 19 months, she resigned from the NYU Medical Center because they had no place for her on the Psychiatric Unit and she was, in fact, placed on a surgical service, specifically the Orthopedic Section. She then worked for the Payne-Whitney Hospital and left for another psychiatric hospital, then went back to the Payne-Whitney with a handicap plate and the Payne-Whitney was able to offer her, therefore, a parking spot near the hospital.

In 1993, she came to the Boston area and worked for one year at the McLean Hospital, then came to the Psychiatric Service at the Boston VAMC. At the time of her transfer to the Boston VAMC, she was seen by the physician's assistant in the Employee Health Section and he indicated on her "Certificate of Medical Examination" that she had had "no limiting conditions for this job". This was for a position titled "RN". Since arrival here, she has worked constantly on the Psychiatry Ward.

*(Continue on reverse side)*

PATIENT'S IDENTIFICATION *(For typed or written entries give: Name—last, first, middle; grade; rank; rate; hospital or medical facility)*

Enica, Lucia    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

| REGISTER NO. | WARD NO. |

**PROGRESS NOTES**
STANDARD FORM 509 (Rev. 11-77)
Prescribed by GSA/ICMR,
FIRMR(41CFR)201-45.505

509-111

7 of 20

## PROGRESS NOTES

**OBJECTIVE:** Examination reveals a female patient who has a slight limp in gait and, in stance, is down about 2 cm. on her right side when standing with equal weight on both legs.

Examination of her right femur reveals longitudinal scars which are well-healed of about 23 cm. altogether. She also has a pelvic brim scar. The right thigh circumference is approximately 5 cm. less than the left thigh.

Her right ankle dorsiflexes only to neutral, whereas her left ankle dorsiflexes approximately 20 degrees beyond neutral. Both ankles actively plantar flex about 45 degrees but the motor strength for the right ankle plantar flexors is only in the 3+/5 and the dorsiflexors of the right ankle are only in the 2- range. Her right knee hyperextends about 15 degrees and flexes to about 120 degrees. In maximal extension, it is stable whereas in 30 degrees of flexion it has midlateral motion to varus and valgus stress. In full extension or in neutral, the extensors of the right knee can extend the knee against the gravity but essentially no resistance. The left knee, on the other hand, can extend against full resistance without problem.

The right hip flexes to 120 degrees and extends 15 degrees with a negative Thomas test.

**ASSESSMENT:** Residuals poliomyelitis with partial paralysis right lower extremity, particularly right knee.

My assessment of this matter is that Ms. Enica can not pick up or carry 45 lbs. of weight. In fact, without something to carry her weight when she is standing on her right leg only, she can neither carry 45 lbs. nor push 45 lbs. In fact, she is barely able to push the 15 lbs. which Dr. Wright of the Harvard Community Health Plan proposed in his note of May 6, 1996.

**PLAN:** I told all of this to Ms. Enica and suggested that she go to the Nursing Service with this information as soon as possible to work out with them exactly what will be done by the Nursing Service.

JOHN McA. HARRIS, III, M.D.

cc:  Lucia Enica, RN

12 of 20

# Exhibit F

2a
97/274

| VA Department of Veterans Affairs | **COMPLAINT OF EMPLOYMENT DISCRIMINATION** |
|---|---|

*NOTE: Please read instructions on the reverse of this form before proceeding.*

| 1. NAME OF COMPLAINANT | 2. HOME ADDRESS | 3A. HOME TELEPHONE NO. |
|---|---|---|
| Lucia Enica | 47 Chipman Street Medford, MA 02155 | (617)396-4094 |
|  |  | 3B. WORK TELEPHONE NO. (617)232-9500 ext. 6 |

| 4. NAME OF VA FACILITY | 5. ADDRESS OF VA FACILITY | 6. YOUR JOB TITLE |
|---|---|---|
| VA Medical Center | 150 S. Huntington Avenue Boston, MA 02130 | Staff RN |

**7. BASIS OF COMPLAINT** *(Check one or more, as appropriate)*

- [ ] RACE *(Specify:_____)*
- [ ] COLOR *(Specify:_____)*
- [ ] RELIGION *(Specify:_____)*
- [ ] SEX *(Specify Male or Female:_____)*
- [x] NATIONAL ORIGIN *(Specify* Romanian *)*
- [ ] AGE *(Specify date of birth:_____)*
- [x] HANDICAP *(Specify:* Polio *)*
- [x] REPRISAL FOR PRIOR EEO ACTIVITY

**8. ISSUE OF COMPLAINT**

**INSTRUCTIONS** - Check one or more issues, as appropriate, which reflect the action or event you are protesting. You must provide a date for each issue checked.

| ISSUE | DATE OCCURRED | ISSUE | DATE OCCURRED |
|---|---|---|---|
| [ ] ADMONISHMENT |  | [x] REASSIGNMENT | 9/95-10/95 |
| [x] ASSIGNMENT OF DUTIES | continuing | [ ] REINSTATEMENT |  |
| [ ] AWARD |  | [x] REPRIMAND | 2/26/97 |
| [ ] CONVERSION TO FULL TIME |  | [ ] RETIREMENT |  |
| [ ] DEMOTION |  | [ ] SEXUAL HARASSMENT |  |
| [x] DUTY HOURS | continuing | [ ] SUSPENSION |  |
| [ ] EXAMINATION/TEST |  | [ ] TERMINATION/REMOVAL |  |
| [ ] FAILURE TO HIRE |  | [x] TIME AND ATTENDANCE | 6/96.1/97 |
| [ ] FAILURE TO PROMOTE |  | [ ] TRAINING |  |
| [x] HARASSMENT | continuing | [x] WORKING CONDITIONS | 4/96 |
| [x] PERFORMANCE APPRAISAL/PROFICIENCY REPORT | 8/28/96 | [ ] OTHER *(Specify)* |  |

**9. SUPPLEMENTAL INFORMATION** (If you contacted an EEO Counselor more than 45 calendar days after the date(s) shown above, or if this complaint is filed more than 15 calendar days after receipt of a Notice of Final Interview with EEO Counselor, you must explain why you were untimely. See instructions on reverse. If you wish to provide additional information about this complaint, please attach an additional page.)

**10. CORRECTIVE ACTION** *(What resolution are you seeking?)*
Placement in the psychiatric nurse liason position
Public apology from Beverly Reardon
Attorneys' fees
Medical fees
Awareness programs for all VA employees
Reevaluation of proficiency report

EXHIBIT

| 11. DO YOU HAVE A REPRESENTATIVE? | 12. NAME AND ADDRESS OF REPRESENTATIVE | 13. HAVE YOU SEEN AN EEO COUNSELOR? |
|---|---|---|
| [x] YES  [ ] NO | Matthew Cobey    Boston, MA 151 Merrimac St., 02114 | [x] YES  [ ] NO *(If "YES," date:_____)* |

| 14. NAME OF YOUR EEO COUNSELOR | 15. HAVE YOU FILED A UNION GRIEVANCE ABOUT THE ISSUE IN ITEM 8? | 16. HAVE YOU FILED AN APPEAL WITH THE MSPB ABOUT THE ISSUE IN ITEM 8? |
|---|---|---|
| Kathleen Burns | [ ] YES  [x] NO *(If "YES," date:_____)* | [ ] YES  [x] NO *(If "YES," date:_____)* |

| 17. SIGNATURE OF COMPLAINANT *(Do not print)* | 18. DATE |
|---|---|
| *Lucia Enica* | 4-9-97 |

VA FORM

# Exhibit G

## DEPARTMENT OF VETERANS AFFAIRS
### OFFICE OF EMPLOYMENT DISCRIMINATION COMPLAINT ADJUDICATION
### WASHINGTON, D.C. 20420

| | |
|---|---|
| Lucia Enica ) | |
| ) | |
| *Complainant*, ) | |
| ) | |
| v. ) | VA Case No.  97-1274 |
| ) | |
| Secretary, ) | |
| Department of Veterans Affairs ) | |
| ) | |
| *Agency.* ) | |

## FINAL AGENCY DECISION

### INTRODUCTION

In a formal EEO complaint dated April 9, 1997, the complainant alleged that officials at the VA Medical Center in Boston, Massachusetts, discriminated against her as referenced below.   The Department accepted the complaint and conducted an investigation.   At the conclusion of the investigation, the Department notified the complainant in writing of the right to request either a hearing before an EEOC administrative judge, followed by a final decision by the Department, or a final decision by the Department without a hearing. The complainant's representative acknowledged receipt of that notice on April 29, 1998. According to the complaint file, the complainant failed to respond to that notice.   Thus, the complaint file was forwarded to the Department's Office of Employment Discrimination Complaint Adjudication for a final agency decision based on the investigative record.

### ISSUE

Whether the Complainant was discriminated against and subjected to continuous harassment based on national origin (Romanian), disability (polio), and in reprisal for protected activity concerning:

a)  her assignment of duties since July 1996,
b)  her duty hours (no dates provided),
c)  her performance appraisal of August 28, 1996,



2.

    d)  her reassignment from September 1995 through October 1995,
    e)  a proposed reprimand on February 26, 1997,
    f)  her time and attendance during April 1996 and January 1997,
    g)  verbal abuse and insults on January 3, 1997,
    h)  a shift change from 3:30 p.m. to 12:00 midnight on January 31, 1997,
    i)  a written reprimand on March 26, 1997,
    j)  her working conditions,
    k)  her right to seek EEO Counseling[1]

## FINDINGS OF FACT

### Reassignment

The Complainant was a Grade II, step 3, staff Registered Nurse at the Boston VA Medical Center.  She claims that she was harassed when she was reassigned to a medical unit from September 1995 through October 1995. Due to agency downsizing there were ward closures at the Boston VA facility in the fall of 1995. The Complainant and all other employees assigned to her ward were reassigned.  The record shows, however, that the Complainant successfully protested a proposed transfer to a medical unit due to her physical condition that resulted from having had polio as a child, and which also restricted her ability to move and lift patients on gurneys.  Her supervisor, (RMO1) instead reassigned her to another psychiatric unit, where she preferred to work. We find that other than her reassignment to another psychiatric ward, there is no evidence that the complainant was reassigned to a medical unit between the dates she alleges.

### Time and attendance

Complainant requested sick leave for scheduled surgery during June 1996. Complainant claims, and the RMO acknowledges, that the RMO approved her leave request for surgery to ensure that the post operative recovery period would coincide with her days off because the ward was "tightly staffed." Thus, the days approved were not the same days that she had requested.

The Complainant claims that RMO2 denied her request for leave to attend school. There is no evidence that any of her leave requests were denied.

### Assignment of duties

The Complainant alleges that she had limited duties.  The duties included administering medication, preparing patient rosters, covering the ward, escorting patients to appointments, and monitoring restraints.  Because of these limited duties she claims she was prevented from maintaining her nursing skills.  The facts do not show that

---

[1] This allegation was not originally accepted. However, the Complainant raised it in her testimony. Therefore, we are considering it in our decision.



3.

Complainant's assignment as a psychiatric nurse required more than those duties she has listed. She fails to state what skills she could not maintain or how her preferred assignment as a psychiatric nurse prevented her from maintaining those skills.

During April 1996, RMO1 asked the Complainant to assist with transporting a psychiatric patient to the medical unit. She protested due to her physical condition, and another nurse was asked instead. Her claim also appears to be that she was harassed by just being asked to perform the task because the RMO was aware of her physical condition. RMO1 testified that he did not believe that the job would require heavy lifting, but when Complainant voiced her concern someone else was assigned to the task.

In January 1997, RMO2 assigned Complainant collateral duties as the Psychiatric Nurse Educator. She was assigned the task of coordinating a family education group. She claims that, because of her schedule, she was not allowed time to meet with the Medical Center Nurse Educator for necessary training.

Management's response to this claim is that Complainant had sufficient time to meet with the Educator for training, but she chose instead to use her time to attend outside classes and take annual leave, thus, resulting in her failure to complete the project. The Complainant does not refute these statements.

Proficiency Report

The Complainant received a "Satisfactory" Proficiency Report on August 28, 1995, and claims that she should have been rated higher. The proficiency report shows that Complainant's "Satisfactory" rating means that she met the rating criteria and at times exceeded expectations. The narrative portion of the report shows that Complainant failed to follow through on some assignments. The response by both responsible management officials indicates that the Complainant was difficult to supervise because she failed to adhere to leave policy by repeatedly not reporting for duty on time. There is no evidence in the record to show that Complainant provided management officials with evidence to refute this statement.

Change of Shift and Duty Hours

On January 31, 1997, Complainant was contacted at her home by RMO1 and told that, due to a staffing shortage, she had to work the 3:30 p.m. to 12:30 a.m. shift. Both RMOs testified that all duties were equitably assigned and that the Complainant was assigned to a rotating shift. They also stated that other nurses were also subjected to some unplanned changes in duty hours in order to accommodate staffing shortages. Documentation of the schedule is included in the record. The Complainant did not refute the testimony on these matters.



4.

## Proposed Reprimand and Written Reprimand

The Complainant claims that on two different occasions, February 14 and 19, 1997, RMO2 verbally counseled Complainant for failing to request leave properly, being insubordinate, engaging in abusive conduct, and being loud in a public area. The verbal counseling on February 19, 1997, is not denied by the RMO. Complainant's infractions resulted in a proposed reprimand issued to her on February 26, 1997. She was later issued a written reprimand on March 26, 1997, for insubordination and failure to follow proper leave request policy.

## Right to seek EEO Counseling

The Complainant claims that the responsible management officials attempted to prevent her from meeting with her EEO Counselor. However, the record indicates that her supervisors merely questioned her about her meetings because she had scheduled them during duty hours without requesting leave to do so.

## General Working Conditions

The Complainant attended a meeting on January 3, 1997 with RMO1 and RMO2 to discuss her use of leave to attend school. She claims that during the meeting they verbally abused and insulted her. She does not state what was specifically said during the meeting. Both RMOs admitted that they met with Complainant, to discuss concerns, but that she would not cooperate. She protested loudly that she was being harassed, and told them she was not going to cooperate. Both RMOs deny insulting or abusing Complainant. The response from the RMOs concerning Complainant's school attendance is that they approved all of her leave requests and she did not miss an opportunity to attend school due to her schedule. The Complainant did not refute the testimony on these matters.

The Complainant also claims that RMO2 was insensitive to her when she experienced an anxiety attack. It is not clear from Complainant's statements which incident she refers to, since there are facts indicating that she suffered a "panic attack" on February 14, 1997, and chest pains on February 19, 1997. However, since RMO2's response refers to the incident on the 19th, we assume that this is the incident she is referring to. The record shows that the Complainant was visibly upset when she reported for her meeting with the EEO Counselor on February 19, 1997. According to the record, Complainant became increasingly distraught and did not believe that she could report for duty, and thus, the counselor telephoned her supervisor on her behalf. Upon receiving the news concerning the complainant, RMO2 informed the counselor that Complainant needed to report to Employee Health so that she could be excused. She added that if she failed to do so and went home without a medical excuse she would be reported AWOL. This response by the RMO seems to be what Complainant refers to as insensitive.



5.

Complainant also claims that she was systematically excluded from team meetings, and that nurse aides were told not to follow her instructions. She fails to provide evidence to support these claims.

As to her national origin claim, one nurse testified that the Complainant was teased by patients about her accent. However, there is no evidence that she complained about the patients' conduct towards her. Also, there is no evidence that any staff or management officials ever referred to her national origin. The record shows that it was the Complainant who constantly talked about the fact that she was from Romania.

## LEGAL ANALYSIS

The law prohibiting discrimination based on national origin or reprisal is Title VII of the Civil Rights Act of 1964, as amended, Section 701 et seq., 42 U.S.C. 2000e et seq. ("Title VII"). The law prohibiting discrimination based on disability is the Rehabilitation Act of 1973, as amended, 29 U.S.C. 706; 791 et seq. Complaints of disability discrimination alleging disparate treatment are analyzed using the analytical model developed under Title VII case law. <u>Prewitt v. U.S. Postal Service</u>, 662 F.2d 292, 27 FEP Cases 1043 (5th Cir. 1981). Federal sector equal employment opportunity regulations are set out in 29 C.F.R. Part 1614.

Generally, the adjudication of a complaint of discrimination alleging disparate treatment under Title VII and the Rehabilitation Act follows a three-step evidentiary analysis. First, the burden is on the complainant to establish a prima facie case of discrimination by a preponderance of the evidence. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 5 FEP Cases 965 (1973); <u>Board of Trustees of Keene State College v. Sweeney</u>, 439 U.S. 24, 18 FEP Cases 520 (1978); <u>Furnco Construction Corporation v. Waters</u>, 438 U.S. 567, 17 FEP Cases 1062 (1978). This means that the complainant must present a body of evidence such that, were it not rebutted, the trier of fact could conclude that unlawful discrimination did occur. <u>Teamsters v. U.S.</u>, 431 U.S. 324, 14 FEP Cases 1514 (1977). A complainant raises an inference of discrimination by showing that the reasons most commonly given by management to justify a particular employment decision or action do not apply in the complainant's case.

Second, if the complainant meets the burden of presenting a prima facie case, then management has a burden of production to articulate some legitimate, nondiscriminatory reason for its actions. <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 25 FEP Cases 113 (1981); <u>Page v. United States Industries</u>, 726 F.2d 1038, 34 FEP Cases 430 (5th Cir. 1984). The evidence presented by management need not establish management's actual motivation, but must be sufficient to raise a genuine issue of material fact as to whether management discriminated against the complainant. If management meets this burden of production, the presumption of discrimination raised by the prima facie case is rebutted and drops from the case altogether. <u>Burdine</u>, 25 FEP Cases 116.



6.

Third, in order to prevail, the complainant must show by a preponderance of the evidence that management's stated reason is a pretext for discrimination. Price Waterhouse v. Hopkins, 490 U.S. 228, 49 FEP Cases 954 (1989); Burdine, 25 FEP Cases 116; McDonnell Douglas, 5 FEP Cases 970. The complainant may show pretext by evidence that a discriminatory reason more likely than not motivated management, that management's articulated reasons are unworthy of belief, that management has a policy or practice disfavoring the complainant's protected class, that management has discriminated against the complainant in the past, or that management has traditionally reacted improperly to legitimate civil rights activities. See McDonnell Douglas, 5 FEP Cases 970.

The ultimate burden of showing that management intentionally discriminated against the complainant remains at all times with the complainant. United States Postal Service Board of Governors v. Aikens, 460 U.S. 711, 31 FEP Cases 609 (1983); Burdine, 25 FEP Cases 116. As the Court stated in Bodenheimer v. PPG Industries, Inc., 5 F.2d 955, 957 (5th Cir. 1993):

> Prior to the Supreme Court's recent decision in St. Mary's Honor Center v. Hicks, ____ U.S. ____ 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), confusion reigned among the circuit courts as to whether the complainant could prove employment discrimination simply by showing that management's reasons were not credible. See, St. Mary's, ____ U.S. ____ 113 S.Ct. at 2750. The Court in St. Mary's put the issue to bed. To prevail ultimately, the complainant must prove, through a preponderance of the evidence, that the employer's reasons were not the true reasons for the employment decisions and that unlawful discrimination was. [emphasis added]

Each complaint of discrimination is to be adjudicated within the context of its particular facts and circumstances. The analytical approach established in McDonnell Douglas "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." Furnco, 17 FEP Cases 1066. Thus, in cases where management has provided a legitimate, nondiscriminatory explanation for its actions, whether or not a complainant properly made out a prima facie case is no longer relevant. The correct focus is whether the complainant proved that management's explanation is a pretext to mask discrimination. United States Postal Service Board of Governors v. Aikens, 460 U.S. 711, 31 FEP Cases 609 (1983).

In cases involving reprisal, the criteria for establishing a prima facie case may require a showing that (1) the complainant engaged in a protected activity, (2) management was aware of the complainant's participation in the protected activity, (3) management effected some action which adversely impacted upon the complainant following the protected activity, and (4) the management action followed the protected activity within



7.

such a period of time that a retaliatory motive can be inferred. <u>Hochstadt v. Worcester Foundation for Experimental Biology, Inc.</u>, 425 F. Supp. 318, 11 FEP Cases 1426 (D. Mass. 1976), aff'd, 545 F.2d 222, 13 FEP Cases 804 (1st Cir. 1976).

The action required in the third element need not be an ultimate, or even significant, personnel action. Any action by a management official likely to have a chilling effect on an employee's right to participate in the EEO process, or otherwise oppose unlawful discrimination, is sufficient to satisfy this element of proof. <u>Hashimoto v. Dalton</u>, 118 F.3d 671, 676 (9th Cir. 1997); <u>Knox v. State of Indiana</u>, 93 F. 3d 1327, 1334 (7th Cir. 1976); <u>DeAngelis v. El Paso Municipal Police Officer's Ass'n.</u>, 51 F.3d 591 (5th Cir.), <u>cert. denied</u>, 116 S.Ct. 473 (1995) (retaliatory harassment creating a hostile work environment violates Title VII even absent a significant personnel action). <u>See also</u>, <u>EEOC Compliance Manual</u>, Vol. 2, Section 8, p. 8-13 (Retaliation).

As noted above, the Rehabilitation Act, 29 U.S.C. Section 701 et seq.[2], prohibits discrimination based on disability. The Complainant's claim is not that she was denied reasonable accommodation, but rather, that she was treated disparately because of a disability. Allegations of disparate treatment due to a disability are analyzed according to the traditional burdens of proof in disparate treatment cases involving other prohibited bases. <u>Prewitt v. U.S. Postal Service</u>, 662 F.2d 292, 27 FEP Cases 1043, 1055, 1056 (5th Cir. 1981). To establish a prima facie case of disability discrimination under the disparate treatment theory, a complainant must generally show (1) the existence of a disability as defined in EEOC Regulation 29 C.F.R. Section 1614.203(a)(1); (2) he or she is a <u>qualified</u> person with a disability as defined in 29 C.F.R. Section 1614.203(a)(6); (3) the employer had knowledge of the disability; and (4) he or she was subjected to an adverse personnel action under circumstances giving rise to an inference of disability discrimination (e.g., treated differently than similarly situated employees who are not handicapped or who have different handicaps). <u>See</u>, <u>e.g.</u>, <u>Prewitt</u>, 27 FEP Cases at 1055; <u>EEOC Management Directive 110</u>, Ch. 5, Attachment A-6; <u>French v. Veterans Administration</u>, EEOC Appeal No. 01850839 (1987); <u>Oberg v. Sec'y of the Navy</u>, EEOC Request No. 05890451 (1989).

A necessary component of a prima facie case of disability discrimination, regardless of the theory under which the claim is brought, is a showing that the complainant is a qualified individual with disabilities within the meaning of 29 C.F.R. Section 1614.203(a). According to the regulation, an individual with disabilities[3] means any person who has a

---

[2] Under recent amendments to the Rehabilitation Act, 29 U.S.C. § 791(g), the standards used to determine whether the Rehabilitation Act has been violated shall be the same as the standards applied under Title I of the Americans with Disabilities Act of 1990, and the provisions of Sections 501, 504, and 510 of the ADA, as such sections relate to employment. Hence, interpretations of the ADA by the EEOC and the courts, as they relate to employment discrimination, will also apply to claims under the Rehabilitation Act.

[3] EEOC's governing regulations still use the outdated term "handicaps." The regulations were issued prior to the 1992 Amendments to the Rehabilitation Act that changed the terminology and have not been revised to reflect this change. The Commission, however, now reads its regulations as referring to persons with "disabilities", not handicaps.

8.

physical or mental impairment that substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment. Major life activities include caring for one's self, performing manual tasks, walking seeing, hearing, speaking, breathing, learning, and working. See, 29 C.F.R. Section 1614.203(a)(3). A qualified individual with disabilities means, with respect to employment, a person with disabilities who, with or without reasonable accommodation, can perform the essential functions of the position in question without endangering the health and safety of the individual or others and who, depending upon the type of appointment authority being used, either meets the experience and/or education requirements of the position in question or meets the criteria for appointment under one of the special appointing authorities for individuals with disabilities. See, 29 C.F.R. Section 1614.203(a)(6).

Discriminatory harassment based on national origin, disability or reprisal consists of personal slurs or other denigrating or insulting verbal or physical conduct relating to an individual's national origin, disability or prior EEO activity. See, e.g., 29 C.F.R. Section 1606.8 (national origin discrimination). Harassment directed against an individual because of that individual's national origin, disability or reprisal may violate Title VII and the Rehabilitation Act. Davis v. U.S. Postal Service, EEOC Appeal No. 01832914 (July 23, 1987); Criner v. Department of the Navy, EEOC Request No. 05880097 (July 21, 1988).

In cases involving harassment, court and EEOC decisions have modified somewhat the McDonnell Douglas analytical approach in order to achieve "a sensible, orderly way to evaluate the evidence." To establish a prima facie case of harassment, the complainant must show: (1) membership in a protected class; (2) unwelcome personal slurs or other denigrating or insulting verbal or physical conduct ; (3) that the harassment complained of was based on the complainant's membership in the protected class; and (4) that the harassment was sufficiently severe or pervasive to affect a term or condition of employment, and/or that the harassment had the purpose or effect of unreasonably interfering with complainant's work performance and/or that the harassment had the purpose or effect of creating an intimidating, hostile, or offensive work environment. Compare McGinnis v. Secretary of Defense, EEOC Appeal No. 01902760 (November 15, 1990); Sexton v. U. S. Marine Corps, EEOC Appeal No. 01821475 (August 30, 1983); Cudjoe v. Secretary of the Navy, EEOC Appeal No. 01880743 (June 14, 1988); 29 C.F.R. Section 1604.11 (sexual harassment). In cases involving harassment by coworkers, the complainant must also show as part of the prima facie case that management failed to take prompt and appropriate action although it was aware of the harassment. Lutticken v. Secretary of Health and Human Services, EEOC Request No. 05900386 (April 27, 1990).

For harassment to be considered discriminatory, it must be severe or pervasive. Harris v. Forklift Systems, Inc., 114 U.S. 367, 63 FEP Cases 225 (1993). Actual psychological or emotional injury is not required. Harris, p. 228. However, unless the conduct is very severe or persistent, a single incident or group of isolated incidents will not be regarded as discriminatory harassment. See e.g. Scott v. Sears Roebuck and Co., 798 F.2d 210,



9.

41 FEP Cases 805 (7th Cir. 1986); <u>Hansen v. Rice</u>, EEOC Appeal No. 01920621 (September 10, 1992). "Harassment, as the term is used in Title VII cases, refers to more than being subjected to stress." <u>Lin v. U.S. Postal Service</u>, EEOC Appeal No. 01932880 (December 23, 1993).

The following factors are pertinent to determining whether a work environment is hostile, intimidating, or abusive: (1) whether the conduct in question is verbal or physical, or both; (2) whether the conduct was repeated, and, if so, how frequently; (3) whether the conduct was hostile or patently offensive; (4) whether the alleged harasser was a supervisor or a coworker; (5) whether more than one person joined in the harassment; and (6) whether the harassment was directed at more than one individual. <u>King v. Hillen</u>, 21 F.3d 1572, 64 FEP Cases 754 (Fed. Cir. 1994); <u>Crane</u>, EEOC Appeal No. 01924585 (April 22, 1993). Evidence of the general working atmosphere involving employees other than the complainant is also relevant to the issue of whether a hostile work environment exists. <u>Vinson v. Taylor</u>, 753 F.2d 141, 36 FEP Cases 1423 (D.C. Cir. 1985), <u>aff'd</u> in <u>relevant part</u> and <u>rev'd</u> in <u>part, sub nom Meritor Federal Savings Bank v. Vinson</u>, 477 U.S. 57, 40 FEP Cases 1822 (1986); <u>Delgado v. Lehman</u>, 665 F. Supp. 460 (E.D. Va. 1987).

The conduct in question should be evaluated from the standpoint of a reasonable person, taking into account the particular context in which it occurred. <u>Highlander v. K.F.C. National Management Co.</u>, 805 F.2d 804, 42 FEP Cases 654 (6th Cir. 1986). Conduct that is not severe or pervasive enough to create an objectively hostile or abusive environment -- an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview. <u>Harris</u>, p. 228. Furthermore, if the complainant does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of employment, and there is no Title VII violation. <u>Harris</u>, pp. 227, 228.

A prima facie case of harassment may be rebutted by the production of evidence to show that: (1) the alleged conduct did not occur; (2) the conduct complained of was not unwelcome; and/or (3) the alleged harassment was not sufficiently severe or pervasive to adversely affect the complainant's employment opportunities, to unreasonably interfere with the complainant's performance, or to create an abusive working environment. Even where harassment has occurred, management may avoid Title VII liability for the harassment by showing that: (1) management took prompt and appropriate remedial action as soon as it became aware of the circumstances (a defense which applies only to harassment by <u>coworkers</u>); and/or (2) there is no basis under agency principles for imputing liability to the employer. <u>McGinnis</u>, EEOC Appeal No. 01902760; <u>Quinn v. Postmaster General</u>, EEOC Request No. 05900546 (August 23, 1990); <u>Crane v. Postmaster General</u>, EEOC Appeal No. 01924585 (April 22, 1993).

An employer is liable for harassment created by a supervisor with immediate or successively higher authority over a victimized employee. However, where no tangible employment action has been taken by the supervisor, the employer may avoid liability by showing: (1) that the employer exercised reasonable care to prevent and correct



10.

promptly any harassing behavior; and (2) that the complainant unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise. The employer may not avoid liability when the supervisor's harassment culminates in a tangible employment action such as discharge, demotion, or undesirable reassignment. <u>Burlington Industries, Inc. v. Ellerth</u>, No. 97-569 (U.S. Sup. Ct. June 26, 1998); <u>Faragher v. City of Boca Raton</u>, No. 97-282 (U.S. Sup. Ct. June 26, 1998). See also, <u>Deffenbaugh-Williams v. Wal-Mart Stores</u>, ___F.3d ___1998 (5th Cir. 1998) (applying the liability principles in sexual harassment cases established in <u>Faragher</u> and <u>Ellerth</u> to claims of racial harassment).

Applying the foregoing principles to the complainant's allegation of discriminatory harassment, we must first determine whether the alleged discriminatory conduct occurred. Then we must determine whether the conduct that occurred constitutes harassment within the meaning of Title VII. If discriminatory harassment is found, we must then determine whether management is liable for the harassment.

**Discussion**

**1. Prima Facie Case**

**A. Harassment**

Complainant alleges that several incidents occurred, however, there are some incidents that did not occur as she alleged. The facts do not establish that the Complainant was reassigned to a medical unit during the period she alleges, and management officials deny that they verbally abused or insulted the Complainant during their meeting. They indicated that Complainant accused them of harassment due to their attempt to discuss with her constructively the need to improve work performance and conduct. The Complainant does not state what specifically was said or done to her during the meeting that was abusive or insulting, and there were no witnesses. Also, there is no evidence that Complainant's request for sick leave was not approved. Management officials contend that all of Complainant's requests for leave were approved.

The other incidents alleged by Complainant as harassment involve only routine administrative actions, and were sufficiently explained by the RMOs. The Complainant does not provide facts to show that any of the incidents occurred because of her national origin, disability or protected activity, and were pervasive or severe so as to rise to the level of harassment.

A showing of discriminatory harassment "must include discrete comments directed against the complainant or disparate treatment which supports an inference of discriminatory harassment." <u>Lin</u>, EEOC Appeal No. 01932880. Accordingly, it is appropriate to review a complainant's allegations under a disparate treatment analysis where there is no direct evidence of discriminatory harassment, that is, where there is no evidence of personal slurs or other denigrating or insulting verbal or physical conduct relating to the complainant's membership in a protected class. Since there is no direct



11.

evidence of discriminatory harassment, the Complainant's claim is more appropriately analyzed under the disparate treatment theory.

## B. Disparate Treatment

National origin

The Complainant established that she is a member of a protected group by virtue of her national origin (Romania).  She failed to demonstrate, however, that she was treated differently than similarly situated persons outside of her protected group with respect to the incidents alleged in this complaint. She also failed to establish that there is a causal connection between her national origin and management's decisions regarding the issues raised.  Accordingly, we find that the Complainant failed to establish a prima facie case of national origin discrimination.

Reprisal

The Complainant has established that she engaged in prior protected activity, and that the Responsible Management Officials were aware of that activity, as they were also involved.  However, she has not established a nexus between her prior protected activity and all of the incidents. There is no evidence that she engaged in any protected activity prior to the February 14, 1997 date, and therefore, there is no connection between her EEO activity and all of the incidents that occurred prior to that date. However, she has established a nexus as to the proposed reprimand on February 26, 1997, and the reprimand that was issued on March 26, 1997, which occurred just over one month after she initiated EEO Counseling.  However, the proposed reprimand was a preliminary personnel step to the actual reprimand.  The Complainant has therefore established a prima facie case of reprisal as to the March 26 reprimand as that was the only incident occurring after her February 14, 1997 contact with the counselor.

Disability

In order for the complainant to establish a prima facie case of disability discrimination she must first show that she is an individual with a disability within the meaning of the Rehabilitation Act. See, 29 C.F.R. Section 1614.203(a)(1).   The Complainant must show that she has a physical or mental impairment that substantially limits a major life activity, or has a record of such impairment, or is regarded as having such impairment. 29 C.F.R. Section 1614.203(a)(3).

The record shows that the complainant was diagnosed with infantile paralysis, or Polio, as a child, which effected her legs with weakness. The limited duty assignment given the Complainant on the psychiatric ward as an accommodation provides some indication of the effects of her condition. Medical documentation from the Employee Health Physician indicates that the Complainant can not lift, push or carry 45 pounds. Her private physician stated that she can not bend or crouch, or lift over 15 pounds, and



12.

should not engage in repetitive low back activity, and is not suited for medical or surgical nursing.

Notwithstanding the difference of opinion by the physicians as to her lifting restrictions, there is no evidence in the record that either of these restrictions substantially limit any major life activities. Additionally, Complainant was not routinely required to push and lift patients on the psychiatric ward, therefore, she was able to do her job.

Individuals are also afforded the protection of the Rehabilitation Act if they that they are regarded as an individual with a disability. We could conclude that Complainant's reassignment to the psychiatric ward suggested that she was possibly perceived as being disabled.

In order to establish a prima facie case of disability discrimination, the Complainant must also show that she is a *qualified individual with a disability*. A qualified individual with disabilities means with respect to employment, a person with disabilities who, with or without reasonable accommodation, can perform the essential functions of the position in question without endangering the health and safety of the individual or others. 29 C.F.R. Section 1614.203(a)(6).

There is no dispute as to whether the Complainant is qualified for the position, and that she can perform the essential duties of the position of psychiatric nurse. Accordingly, we find that the Complainant is a qualified individual with a disability for the purposes of 29 C.F.R. Section 1614.203 (a)(6).

In addition to establishing that she is a qualified individual with a disability, the Complainant has demonstrated that she was subjected to an adverse personnel action when she received a written reprimand on March 26, 1997. However, the Complainant fails to provide facts to show that she was treated less favorably than similarly situated individuals who are not disabled with respect to disciplinary actions. Also, the Complainant does not provide facts to establish a causal connection between the reprimand and her protected status. The Complainant has therefore failed to establish a prima facie case of disability discrimination.

Nevertheless, we recognize that the complainant's burden to establish a prima facie case is not onerous. Furthermore, under the rule in Aikens, whether a complainant actually makes out a prima facie case of discrimination is irrelevant where management offers a legitimate, nondiscriminatory reason for its actions toward the complainant. Thus, we continue our analysis despite the deficiencies in the complainant's prima facie evidence.

## 2. Management's Articulated Reasons

The burden shifts to management officials to articulate legitimate, nondiscriminatory, reasons for their actions. They have met this burden. We refer to management's responses to Complainant's allegations as stated above in the Findings of Fact.



13.



### 3. Pretext

The Complainant did not present any evidence to establish pretext. There is no direct or indirect evidence in the record that would otherwise establish that management's articulated reasons are unworthy of belief or that management was motivated by discriminatory animus. Thus, we find that the Complainant failed to establish that management's articulated reasons are pretextual.

### CONCLUSION

The Complainant has failed to establish by a preponderance of the evidence that she was discriminated against or subjected to harassment based on national origin, disability, or reprisal with respect to the issues raised in this complaint.

### RIGHT OF APPEAL

This Final Agency Decision may be appealed within <u>30 calendar days</u> of receipt. The appeal should be addressed to:    **Equal Employment Opportunity Commission, Office of Federal Operations, P.O. Box 19848, Washington, D.C. 20036.**   If an appeal is filed, EEOC Form 573 should be used.   A copy of EEOC Form 573 is attached.

A copy of the appeal to the EEOC <u>must</u> also be sent to the VA Office of General Counsel at the following address:   **Department of Veterans Affairs, Office of the General Counsel (024), 810 Vermont Ave., N.W., Washington, D.C. 20420.**

Statements or briefs in support of the appeal must be submitted to the EEOC within 30 calendar days of the filing of the appeal.   <u>A copy of any such statement or brief, including any statements made on EEOC's "Appellant Docketing Statement," must also be sent to the VA Office of General Counsel at the above address.</u>

If an appeal is filed with the EEOC, the appeal, and any subsequently filed statement or brief, must contain a statement certifying the date and method by which copies of these documents were served on the VA Office of General Counsel.

### RIGHT TO FILE A CIVIL ACTION

A civil action may also be filed in an appropriate United States District Court.   A civil action may be filed:

> within 90 days of receipt of this final decision <u>if no appeal to EEOC has been filed</u>; or,

> if an appeal is filed with the EEOC, within 90 days after receipt of EEOC's final decision on the appeal; or,



14.

after 180 days from the date of filing an appeal with the EEOC if there has been no final decision by the EEOC.

If a civil action is filed, the head of the Department of Veterans Affairs must be named as the defendant. The head of the Department of Veterans Affairs is **Togo D. West, Jr.** The official title of the head of the Department must also be stated. Mr. West's official title is **Secretary of Veterans Affairs.** Failure to provide the name and official title of the head of the Department may result in dismissal of the case.

If a civil action is filed under Title VII (discrimination due to race, color, religion, sex, national origin, or reprisal); or under the Rehabilitation Act of 1973, as amended,(discrimination due to disability), and if a complainant does not have, or cannot afford the services of, an attorney, the Court may, upon a complainant's request, appoint an attorney to represent the complainant and permit the filing of the action without payment of fees, costs, or other security. **The grant or denial of the request is within the sole discretion of the Court.** Filing a request for an attorney does not extend the time in which to file a civil action. Both the request and the civil action <u>MUST BE FILED WITHIN NINETY (90) CALENDAR DAYS</u> of the date of receipt of this final agency decision or, if this decision is appealed to the EEOC, within <u>NINETY (90) CALENDAR DAYS</u> of the date of receipt of the EEOC's final decision on the appeal.

_____        _____

Charles R. Delobe                                          Date
Director, Office of
Employment Discrimination
Complaint Adjudication

Attachment:   EEOC Form 573