UNITED STATES OF AMERICA
DISTRICT COURT
FOR THE EASTERN DISTRICT OF MASSACHUSETTS

Docket No. 04CV11468

---

Lucia Enica                              )
                                         )
            Plaintiff,                   )
                                         )
                                         )
            vs.                          )
                                         )
                                         )
Anthony J. Principi, as he is Secretary  )
of the Department of Veteran Affairs     )
et al.                                   )
                        Defendants       )
                                         )

---

## AFFIDAVIT OF LUCIA ENICA IN OPPOSITION TO DEFENDANTS CROSS-MOTIONS FOR SUMMARY JUDGMENT

**Now comes plaintiff and says as follows as to the following numbered paragraphs of the defendants' statement of facts pursuant to Rule 56.1:**

#*5.* It is true that I was hired as a psychiatric nurse. I attach my resume (Exhibit 'A') which indicates that as my experience. The application was for this position and my interview was with Mary Faren, who was the head nurse on one of the psychiatric units at the time. This is true even if I was technical hired in

the title of 'registered nurse' which I also was. I did not come to work in medical wards.

#7. The fitness for duty examination was done before being hired in 1994, and although I had obvious disabilities, none interfered with my work at that time.

#8. Later in **1995,** when I was informed that the psychiatric unit I was working on would close and it was said that I would be sent to work on a medical surgical unit, I reminded all my supervisors, from my Head Nurse to the Chief of nursing that I am not able to do so due to my health history of polio which was documented during the fitness for duty prior to being hired. Everybody was aware of my handicap due to my limping, not to mention the frequent questions I was constantly asked by my colleagues regarding my limping and my handicap automobile driving plates. I was asked to bring a medical note when I mentioned my physical limitations for medical work, and I did so on **10/30/95.**   See also my answer to Interrogatory No 13 & 14.

# 9. It is true that I was not strong enough to take the Patient to the ECT that day in 1996   which required that I also push the stretcher by myself to the operating room, stay with the patient until ECT was done and push the patient back to the floor and into his room and help him to get off the stretcher and place him in bed safely (as you know all VA patients are

adults, most males and very few with a weight less than 45 lbs. I wasn't supposed to do such a physical task in the first place. The VA after this incident ordered me to bring another medical note from my doctor with specific directions regarding my physical ability to do such physical tasks, which I did on *5/6/96*. See also my answer to Interrogatory No. 13 & 14.

#11. My supervisor did not like this limitation and a fitness for duty with the VA chief Orthopedic service was done *7/25/96* and I severely limited my physical capabilities for duty. (See defendant's paragraphs 12 & 13 & 14 and the report.) All this time I was assigned to take patients to ECT.

#12.  Dr. Harris' report speaks for itself.

#13. Dr Harris never discussed his report with me. He only sent me back to the nursing office. I was told to return to my unit and my supervisor floated me to a medical unit for the rest of the day where I was asked to transport a patient in a wheelchair to some test.

Dr Harris written report appears to be a dictation, dated with the date of the physical exam *7/25/96,* containing a correction dated 7/29/96. I never saw this report until many years later nor did anyone at to work tell me of its contents, so I did not

know of its specific contents and limitations. Obviously my supervisors did since they had requested it.

#14. In any event I was aware of my physical limitations. I was the one requesting the VA administration to help me in getting accomodatlons for my disabilities. The VA refused to accommodate my requests or my doctor's requests. Strangely enough my supervisors noticed the problems I was having. (It was not possible for anyone

not to notice my limping) But despite my supervisors' permanent involvement in patient care, and as such, in observing and evaluation of physical and emotional problems, nobody seem to be able to make the connection between my limping, the history of polio and my reports that certain physical tasks were beyond my ability to do them without hurting myself or the patient. Nor did they seem to realize the emotional stress they were inflicting on me with their continuous harassment, by pretending that they don't have enough evidence of my disability to acknowledge it as such. After the limitations in my fitness for duty as described by Dr. Harris the supervisors did not change their actions I was still consistently required to take patients to ECT or floated to medical units, where I was assigned to do only physical tasks for patients. (See also my answer to Interrogatory Number 13 & 14.)

#15.   No. #15 *is* contradicted by the facts in # 16 and #15 is not correct. I was trying the best I could to get some fair treatment and to obtain reasonable work conditions.  I was still consistently assigned to take patients to ECT and I was consistently floated to the medical units to work on a medical floor to do physical tasks that my doctor and the VA doctor stated clearly that I was not fit to do. (See also my answer to interrogatory 13 & 14.)

#17. The EEO did not dispute my physical limitations and they concluded that the VA by **not** transferring me to a medical unit, addressed my required limitations.

#18. I felt lost, confused and demoralized. I did not know what to do and nobody gave me any assistance in helping me with the EEO process, and I did not have the money to hire another lawyer. I have interviewed for a number of psychiatric nursing positions at the outpatient clinic at CA, JP and even Bedford VA but I was always turned down.   I  focused on going back to school and getting a master degree in psychiatric pursing so that with more education and a higher qualification to be able to got a job in which I will not be required to do the physical tasks I was not fit to do.

#19 to 37 my disability aggravated over time and I had again requested reasonable accommodations in May 2002.

 This time the Union promised to help me get
 through the process. I obtained Dr. Harris's report and started to refuse to lift push and pull patients. I had also developed severe arthritis to my right knee and walking began to be a serious problem for me. I requested directions (via E-mail) on what I was suppose to do in order to get reasonable accommodations.

  I did everything I was told to do: providing the Employee Health with medical documentation; Sending my request for accommodation in writing to the chief of service and being specific about what I was not able to do, as instructed but nothing changed.

I sent my request (via E-mail) to everybody who was invested with authority to make a decision regarding my request *for* a position in outpatient psychiatric nursing. (including to Dr. McCarley Robert. (See Exhibit B) He therefore knew of my disabilities directly from me. He received the e-mail as acknowledged on the document..

It is true that the plan was to close the inpatient psychiatric unit at JP, but not the outpatient psychiatry or the substance

abuse program at JP.I was very qualified to work in either of this programs. However nobody took my request for reasonable accommodation by moving to such a unit into consideration.

I was basically informed that I will be transferred to West Roxbury Crisis Stabilization Unit and that they will accommodate my disability in the new job. That hospital would however require much more walking than Jamaica Plain because it was spread out over a large area.

The union said it would get me the accommodations in e writing before the transfer, but she was not able to even obtain it before the transfer.

At West Roxbury in my new position the physical demands of the job worsened. The accommodations provided did not follow my orthopedist's directions. The distance I was forced to walk in my new job was very much longer than in my previous job. I couldn't any longer continue the new walking since I was now experiencing increasing pain in my right leg.

Gradually my back started to hurt constantly, due to this continuous effort to walk as I was required to do. I was very desperate to see that the more I hurt the more I was asked to do.

I was stationed in Bdg. #3 next to the entrance there. The inpatients units are in Bldg 1 (patients units on 3rd, 4th,and 5th floors, long floors as it can be seen in the diagram) and Blg.#2 (patients units on the ground floor, 1st and 2 floor. This is a building designed for patients with spinal cord injury, and as such corridors and rooms are very large to accommodate equipment). The distance from building #3 to Bldg #2 is one quarter of a mile.

According to my new job description, I was suppose to do rounds on the medical units and "8.Provide psychiatric consultation to the West Roxbury VA in-patient units" and

"9.Make rounds of the psychiatric patients housed on the medical units, when time allows."

In the Crisis Stabilization Unit, CSU (mental health) we had 3 beds that could be used for a maximum of 23 hour stay. This was a new type of program. It turned out that we rarely had a patient in the unit, nobody during the first two weeks and about 2 per week since then. Not always on my shift. Because of this I was required having to go to the medical units were what I was doing almost everyday I worked there.

In addition to what I have described I was also expected to participate in the Psychiatric team rounds, conducted by the director of psychiatry (scheduled 3 times a week) Dr. Muffson.

During these rounds, the speed of walking from ward to ward, the amount of walking and standing by the patients bedside and in post conference **in** the hallways was overwhelming for me. I tried not to participate in these rounds but I got pressure from my supervisors to participate.

And again because we had no patients in the CSU, one way the nursing service decided to utilize the psychiatric RNs was to do one to one with agitated psychiatric patients housed on the in-patient units, and as "sitters" for the non psychiatric but confused and agitated patients, or patients that were risk for fall. The psychiatric nurses wanted to rotate in such instances, every hour on the hour and this implied many trips from my place of station to the units, Very often those patients needed to go to some tests someplace in the hospital and  I had to walk with them.

I could never measure exactly the amount of walking I did everyday but by just adding up the trips between my place and the buildings with the wards (without adding the walking on the wards) it was between one and a half and two and a half miles a day.

My doctor requested that I should not do the walking rounds on the word I was working at JPVA, and in my new job I was expected to do rounds in the entire hospital at WRVA and to walk the long distances between the buildings.

At the beginning of August I realized that I could not keep up with this amount of walking. Despite my best efforts to work with the union and the administration I wasn't able to obtain reasonable accommodation. I hired a lawyer.

Nothing was done. I continued to perform my job until September 9. I was taking Celebrex for pain (200mg a day), and the over the counter Glucosamine and Chondroitin. I was in pain constantly. On September 9 I went to stay with a patient on one to one in building 2, AG unit. After an hour a nurse came to replace me. On my way back to my station, on the corridor connecting building 1 to building 3, 1 felt a sharp pain in my lower back and left leg when I was stepping on my left leg (my good leg) I was about to fall. Some hospital staff helped me to the employee health. The NP from EH sends me to be evaluated by my own doctor.

At the end of October, when I was promised a "scooter" for ambulating, I accepted it Now I was using the scooter to travel from my station to the inpatient units. (See also my answer to interrogatory 13 & 14)

#38 I was out of work on Sick leave from September 9th to Nov 3, 2002, for which I filed a workers compensation claim.

After being provided the scooter they change my job again. I was now expected to provide physical care for patients who were not able to physically care for themselves. When I refuse to do it the VA send me home on paid leave until they decided to detail me to TAP in 2003.

60, 61. A position for a psychiatric nurse counselor gets posted at JP in 2003 for which I applied. I tried desperately to interview for it and I get such a run around that not even with the intervention of my lawyer could I find out the circumstances of why the position disappeared until about November 2005. I got no answer before that time on my application. This was in my experience very unusual on job postings which rarely took over 6 months for a response. I got none until my lawyer insisted from the EEO counselor.

62. My lawyer moves to strike Warfield's statement of what Mc Carley did and why he terminated the jobs. My lawyer and I learned that the VA claimed that Dr. McCarley (who was aware of my disability and the need for physical accommodation since 2002) (See Exhibit B) did not care for a nurse counselor because he needed the position for a doctor.

I do not believe that. It should be noticed that although the statement of facts say that two applicants applied for the job, including me, it does not say the other applicant was qualified as I was. In addition no notice of what was happening appeared until over two and one half years from the date of application. Why so long? I believe I was qualified to do the job for which the doctor was hired, at less cost or at least should have been asked and seen a posting which I did not.

I do not believe the motivation was as stated but rather to prevent me from obtaining a job that would place me higher in pay and responsibilities than some of my prior supervisors in mental health notwithstanding my qualifications, and to punish me for seeking my rights including accommodation under the rehabilitation law.

Nothing in the documents provided indicate that the abolishing of the posted job for which I applied, and use of the money over two years later for another purpose, was not to punish me. What happened to the original purpose to create the job for which I applied and the time that passed to do it's responsibilities? There was a prior budget process to post the job and a decision about it. Nothing was brought forward to compare with what it is alleged the doctor did in abolishing the job, and what was said to create and originally justify it. This

silence infers that objectively the doctor's alleged reasons probably are not correctly stated. His failure to sign an affidavit as to his motives and actions infers again by silence, he may not have done what is alleged for the reasons stated.

In my opinion, it has been a pattern with the VA not providing me with accommodation and denying me any positions I have applied for.

Signed under the pains and penalties of perjury this 23rd day of March 2006.

/s/Lucuia Enica.

**EXHIBIT 'A'**

Lucia Enica
80 Bradford Rd #1
Watertown, MA 02172
Tel:(617)926 5692


Professional Objective:      Psychiatric Nurse

Work Experience:

1993 - Present McLean Hospital - Belmont, Massachusetts

Staff Nurse in the Dual Diagnosis Unit - Appleton
Program. The program is focused on the evaluation
and the treatment of patients with Substance Abuse
Problems as well as Dual Diagnosis.
My involvement with this program offered
opportunities to get extensive hands-in experience
in the treatment of patients presenting Alcohol and
Drug Abuse disorders.
My responsibilities consist in evaluating and
applying specific Detoxification Protocols,
Standards of Care and Treatment Therapies in an
inpatient unit.
I was also involved with providing After Care
Treatment to patients who no longer need to be in
inpatient settings but who need comprehensive
psychiatric support and Therapy Treatment in order
to consolidate their early recovery.

1992-1993 Payne Whitney Clinic, New York Hospital, Cornell
Medical Center,
New York

Staff Nurse with a unit having patient population
consisting of geriatric, adult and adolescent
patients presenting mixed psychiatric disorders. My
main responsibilities included primary nursing and
acting periodically as charge nurse.
Also involved with providing group therapy to high
functioning patients.


1989-1992  Hillside Hospital, LU Medical Center, New York

Staff Nurse. During my first year with Hillside
Hospital I worked in open units having patient
population ranging from adolescents to
Geriatrics.
The following six months I was on a flotation
program involving the following units: Schizophrenia
Locked Unit, First Break Locked Unit,

Affective Disorder Locked Unit, Geriatric Locked
Unit, Adolescent
Pavilion Locked Unit and private units both locked
and open.
Upon completion of the flotation program was
assigned to the
Affective Disorder Locked Unit where my
responsibilities have been
extended from primary psychiatric nursing to acting
as charge nurse on a

- rotating schedule. For one year and a half, I was in
charge with the orientation and supervision of the
nursing student groups during their
clinical psychiatric assignments.

For nine months I was in charge with providing group
therapy to high functioning patients.

Payne Whitney Clinic - New York Hospital. Cornell
Medical
Center

Worked as part-time per-diem psychiatric nurse. I
was involved with providing psychiatric patient care
in several units of the clinic. This offered me the
opportunity to get familiar with the psychiatric
disorders and treatment approaches specific to
different patient population categories.

1987-1988  New York University Medical Center

Staff Nurse with the Neuro-Orthopedic Unit. Later
promoted to Senior
Staff Nurse after passing successfully a
professional evaluation
Main responsibilities included providing primary
nursing care to patients
and providing intensive care in the Post-Operatory
unit.

1982-1983  Odgen Food Corporation, New York

Joined the Payroll and Bookkeeping Department as

clerk responsible for data entry into the department

computer system.

1976-1981  National Center for Management in Civil Engineering,

Bucharest, Rumania

16

Joined a team of programmers
implementation of the Contract Management System


Education:

1984 - 1987 New York University, New York
            BS in Nursing, June 1987


1977-1977   School of Data Processing for Management, Bucharest,

            Romania Diploma in Data Processing for Management



Personal Interests:

        Classical music and literature.

References: Professional and personal references available upon
           request.

**EXHIBIT 'B'**

**Could not be sent erlecttronically. Sent by Mail**

**EXHIBIT 'C'**

**Plaintiff's Answers to Defendant's Interrogatories 13 and 14**

Interrogatory Number 13:

Please list and describe each and every discrete incident of handicap discrimination that the VA allegedly subjected you to. Specifically, provide all evidence you have in support of Paragraphs 32 through 34 of the Complaint. For each alleged act of handicap discrimination, identify in your response:

    a.   The time, date, and location of the incident;

    b.   The names and titles (if any) of all persons involved in the incident;

    c.   The names and titles (if any) of all persons who witnessed the incident;

    d.   The date that you reported the incident to VA management, and to whom;

    e.   If applicable, the accommodation that the VA allegedly denied and the VA's stated reason for the alleged denial;

    f.   Any physical or emotional problems ensuing from the alleged act of discrimination; and

    g.   Each and every document in support of these claims.

Answer:

In regard to a-f, the plaintiff says in summary as follows:

1. In or about 1995 or 1996 while working at her job as a psychiatric nurse, Enica began to suffer severe disabling pain when doing certain functions at the VA, i.e. when she

was required to push patients on stretchers from their rooms to have electric convulsive shock treatment among other things. Her doctor in reports on her behalf in regard to such matters, submitted to the VA at its request, asked for physical accommodations for her indicating among other things that because of her polio, low back pain and leg length discrepancy, Enica could not be ordered to crouch, lift over 15 pounds do repetitive low back activity and was not suited for med-surgical floor nursing or repetitive pushing and pulling and also suggested it was not "possible to spell out physical restrictions for all circumstances, nurse must be permitted some discretion among other things due to her disabilities." In said year 1996 the employer also had Enica examined by a doctor employed by the VA as Chief of Orthopedics. His report confirmed her disabilities and in essence also specifically suggested that her doctor's recommendation of limitation for physical activity might not be restrictive enough. This report was delivered to the employer including the supervisors of the plaintiff.

2. As a result of her conditions and these physical limitations confirmed by the doctors' reports, the VA determined that Ms. Enica was required to be accommodated by limiting her work to 'psychiatric' nursing at the VA with the physical limitations required by the doctors in the reports in regard to walking, pushing, lifting and/or standing.

3. The medical and occupational limitations described above in were part of her personnel files and/or reported to and known to her supervisors in the Nursing Department of the now described 'Boston Health Care System', where she was continuously employed by the employer from 1994 until the present and continuing. The Responding Management Officials (hereinafter RMO) at these facilities involved

21

at all relevant times in these matters of alleged discrimination at the facility where the employee worked, she is informed and believes were Ms. Karen Bassett, Coordinator of Mental Health Nursing, Ms. Cecelia McVey, Associate Director of Nursing and Patient Care, Ms. Marry Farren, Nurse Manager the direct supervisor of the plaintiff at Jamaica Plain and at the Nurse Stabilization Unit in West Roxbury, Mr. Denni Woodmansee, Director of the Worker Injury Program, Mr. William Warfield, Chief of Employee Relations in Human Resources Craig S. Poucha, Chief Human Resources Management Services.

4. At all times during her employment with the VA, Enica walked with a noticeable limp and observable limited ability to lift, push or stand, and had therefore had the 'appearance' from this and other things of a person who was obviously disabled and inhibited in certain of her life's functions.

5.  At all times following the medical reports in 1995 and 1996 described above, Enica was treated in certain ways as a person with a 'disability' by her employer, its agents servants and employees, however at all such times the employer its agents servants or employee did not 'reasonably' accommodate all the disabilities as required. Among other things the employer required her to walk longer distances and for long times without aid than was permitted and to lift, pull and do other restricted activities.

6. From 1995 to 2002 while she worked at the psychiatric unit in Jamaica Plain, notwithstanding the required restrictions, the VA failed to reasonably accommodate her in regard to such physical activities to which it assigned her knowing of her limitations, and she was required to continuously do much of the restricted physical activity

which continue to cause her constant pain for which she
was required to take medication. Her supervisors at the VA
did not show Enica the report of the VA Chief of
Orthopedics described above during such time period, nor
tell her of the limitation he described, and the
employer's limitation to the role of a 'psychiatric nurse'
with such physical restrictions, but such supervisors
continued to wrongfully assign her to among other duties
walking long distances and for long times without aid and
do other duties of a 'floating' floor nurse in medical
settings specifically restricted for her.

7. In June 2002, Enica was transferred to the 'Crisis
Stabilization Unit' at West Roxbury when the Jamaica Plain
psychiatric unit was purportedly closed. When the Jamaica
Plain psychiatric unit was planning the move of some its
personnel to said West Roxbury, Enica brought her physical
limitations to her supervisor (s) and human relation's
attention in regard to the job to be performed at West
Roxbury. Enica at the request of said supervisor(s) and
human relations obtained another report from her doctor
dated May 12, 2002, which she presented to them,
incorporated by reference herein. This medical report
again clearly listed what occupational limitations applied
to her and what accommodations she needed which would
still permit her to perform the essential functions of her
job. The report again also set forth specific information
about what Enica could not do at work. Enica asked to stay
at Jamaica Plain, but instead Enica was given a notice of
transfer on June 28, 2002 to West Roxbury to a new
position. The notice included a document 'scope of
practice' which listed some accommodation to some of her
physical conditions, but which document ignored many of
the restrictions described by the doctor in the said May
2002 letter and the other medical letters in 1995 and 1996
described above. She was still transferred and required to

23

do the work of the unit in pain due to the lack of the requested and/or required accommodations being provided for her to be able to do the job.

8. Due to the increased pain from the increased required walking among other things at West Roxbury after her transfer, the plaintiff's representative requested on August 9, 2002 that the facility reconsider the transfer among other things, and asked the employer to comply with the accommodations required in the doctors' letters described above. As of October 1, 2002 the employer did not respond and the situation had not changed so the employee filed 'formal' discrimination charges with the VA.

9. At or about this time as a result of the additional physical activity at West Roxbury from which she was medically restricted but required to do, including but not limited to greatly increased walking every day compared to the walking required at Jamaica Plain, Enica suffered a 'worker compensation' injury arising out of or in the course of her employment, which disabled her from working. As a result she was required to leave work and make a claim for compensation. This injury included but was not limited to developing a 'bursitis' condition in her hips and/or legs aggravating her previous disabilities and causing her great pain among other things.

10. The Veteran's Administration for discriminatory reasons denied her workers compensation claim and her requested accommodations by said claim.

11. The 'Office of Worker's Compensation Program' of the Department of Labor, of the United States, to whom Enica appealed, reversed the January 2003 denial of her claim by the VA, in an appellate decision issued in May 2003

incorporated by reference herein and marked Exhibit 'A'. The decision among other things found that Enica suffered an 'on the job injury' causing increased injury to her prior disabled conditions, requiring further accommodation and compensation from the VA since the failure to accommodate her had led to unsafe conditions at work for Enica causing her the said workers compensation injury.

12. When she returned to work in 2003 after recovering from the injury, the VA upon her request, provided her a 'motorized' scooter as an accommodation to her disabilities, to help with the assigned walking at West Roxbury.

13. Her supervisors however kept assigning her to medical situations on the wards ignoring the other physical restrictions on her of which they knew including being excluded from medical duties on the wards described in among other places the 1995 and 1996 medical reports. These assignments required physical actions with patients to physically support or move them in bed or walking, which the supervisors knew or should have known Enica could not do because of her other physical limitations described in the prior medical reports.

14. The supervisors also failed to notify or seek or gain the help of the floor nurses where she was assigned to aid these physical restrictive conditions of Enica, and caused Enica thereby continued embarrassment, physical and emotional pain, when she could not perform or get help to perform the assigned physical tasks with the patients. These assignments because of her physical limitations to help the patients, put her patients to whom she was assigned to do tasks she could not, in danger. She so noted these matters in the records and her supervisors retaliated by falsely claiming she could not do

appropriate medical jobs, from which jobs she had been restricted by medical reports to the employer and in regard to which the supervisors were aware. The acts described in this paragraph in of themselves were directly discriminatory, and/or a refusal to provide reasonable accommodation and/or retaliatory.

15. When Enica complained about the assignments described in 21 above, the supervisors 1) falsely charged her with inability to perform the required medical tasks such as supporting patients who might fall from bed or while walking to the lavatory, 2) put her on administrative leave requiring her to remain at home and not work, and then later in 2003 3) detailed Enica temporarily to the 'TAP' program so called, (a telephone medical triage system at the hospitals carried out by registered nurses.) She is not required at 'TAP' a nursing position, to walk push or lift. She has successfully performed all of the nursing duties of this position without further accommodation.

16. The VA published by e-mail a notice for an opening at Jamaica Plain for the position of 'Clinical Nurse Specialist' in June 5, 2003 incorporated by reference herein as Exhibit 'B', for which position Enica timely applied. She was at the time of her application eligible in all respects for the position as described. She believes and says she can perform the essential functions of the said position as described in the notice, without any accommodation.

17. The VA then issued a Final Agency Report, which denied the plaintiff's charges for false reasons and failed to address her promotional allegations. The plaintiff says that such report itself continued the acts of handicap discrimination and/ or retaliation by among other things

wrongfully denying the employer's responsibility under the applicable law to provide her reasonable accommodation and/or for acting in a retaliatory manner.

18. After appropriate demands to the employer by the employee's agent, for information about the course of the application and the job, the employer in late April 2004, refused in writing to appoint the plaintiff to the position and the employee believes based on the events described above, the unusually long time to respond, gave false reasons by letter dated May 18, 2004, (incorporated by reference herein a Exhibit C), as part of the pattern of denying her a reasonable accommodation for her handicap and/or as direct handicap discrimination, and or retaliation for filing the formal charges described above.

19. Enica says she believes based on the events described above that the real reason she was denied the promotional position was as part of a continuing pattern of denying her a reasonable accommodation for her handicap, of direct handicap discrimination and/or in retaliation for her filing the above-described discrimination claims against the VA its agents, servants and/or employees. As a result she believes she has also been denied a promotion for which she was eligible and entitled, and thereby suffered also a loss of future higher income to which the position would have exposed her, and other employee benefits among other things.

h.   Incorporate answer to 1 above and include also additional documents provided in response to request for documents.

Interrogatory Number 14:

Please list and describe each and every discrete incident of alleged retaliation that the VA allegedly subjected you to. Specifically, provide all evidence you have in support of Paragraphs 37 through 40 of the Complaint. For each alleged act or retaliation, identify in your response:

   a.    The time and date of the alleged retaliation;

   b.    The names and titles (if any) of all persons involved in the alleged retaliation;

   c.    The names and titles (if any) of all persons who witnessed the alleged retaliation;

   d.    The date that you reported the act of retaliation to VA management, and to whom;

   e.    The protected activity you were engaged in at the time;

   f.    The nature of the alleged retaliation, including any disciplinary actions; and

   g.    Each and every document in support of these claims.

Answer:

In regard to a-f, the plaintiff says in summary as follows:

   1. In or about 1995 or 1996 while working at her job as a psychiatric nurse, Enica began to suffer severe disabling pain when doing certain functions at the VA, i.e. when she was required to push patients on stretchers from their rooms to have electric convulsive shock treatment among other things. Her doctor in reports on her behalf in regard to such matters, submitted to the VA at its request, asked for physical

accommodations for her indicating among other things that because of her polio, low back pain and leg length discrepancy, Enica could not be ordered to crouch, lift over 15 pounds do repetitive low back activity and was not suited for med-surgical floor nursing or repetitive pushing and pulling and also suggested it was not "possible to spell out physical restrictions for all circumstances, nurse must be permitted some discretion among other things due to her disabilities." In said year 1996 the employer also had Enica examined by a doctor employed by the VA as Chief of Orthopedics. His report confirmed her disabilities and in essence also specifically suggested that her doctor's recommendation of limitation for physical activity might not be restrictive enough. This report was delivered to the employer including the supervisors of the plaintiff.

2. As a result of her conditions and these physical limitations confirmed by the doctors' reports, the VA determined that Ms. Enica was required to be accommodated by limiting her work to 'psychiatric' nursing at the VA with the physical limitations required by the doctors in the reports in regard to walking, pushing, lifting and/or standing.

3. The medical and occupational limitations described above in were part of her personnel files and/or reported to and known to her supervisors in the Nursing Department of the now described 'Boston Health Care System', where she

was continuously employed by the employer from 1994 until the present and continuing. The Responding Management Officials (hereinafter RMO) at these facilities involved at all relevant times in these matters of alleged discrimination at the facility where the employee worked, she is informed and believes were Ms. Karen Bassett, Coordinator of Mental Health Nursing, Ms. Cecelia McVey, Associate Director of Nursing and Patient Care, Ms. Marry Farren, Nurse Manager the direct supervisor of the plaintiff at Jamaica Plain and at the Nurse Stabilization Unit in West Roxbury, Mr. Denni Woodmansee, Director of the Worker Injury Program, Mr. William Warfield, Chief of Employee Relations in Human Resources Craig S. Poucha, Chief Human Resources Management Services.

4. At all times during her employment with the VA, Enica walked with a noticeable limp and observable limited ability to lift, push or stand, and had therefore had the 'appearance' from this and other things of a person who was obviously disabled and inhibited in certain of her life's functions.

5. At all times following the medical reports in 1995 and 1996 described above, Enica was treated in certain ways as a person with a 'disability' by her employer, its agents servants and employees, however at all such times the employer its agents servants or employee did not 'reasonably' accommodate all the disabilities as required. Among other things the employer

required her to walk longer distances and for long times without aid than was permitted and to lift, pull and do other restricted activities.

6. From 1995 to 2002 while she worked at the psychiatric unit in Jamaica Plain, notwithstanding the required restrictions, the VA failed to reasonably accommodate her in regard to such physical activities to which it assigned her knowing of her limitations, and she was required to continuously do much of the restricted physical activity which continue to cause her constant pain for which she was required to take medication. Her supervisors at the VA did not show Enica the report of the VA Chief of Orthopedics described above during such time period, nor tell her of the limitation he described, and the employer's limitation to the role of a 'psychiatric nurse' with such physical restrictions, but such supervisors continued to wrongfully assign her to among other duties walking long distances and for long times without aid and do other duties of a 'floating' floor nurse in medical settings specifically restricted for her.

7. In June 2002, Enica was transferred to the 'Crisis Stabilization Unit' at West Roxbury when the Jamaica Plain psychiatric unit was purportedly closed. When the Jamaica Plain psychiatric unit was planning the move of some its personnel to said West Roxbury, Enica brought her physical limitations to her supervisor (s) and human relation's attention in regard to the job to be performed at West Roxbury. Enica at the request of said supervisor(s) and human relations obtained

another report from her doctor dated May 12,
2002, which she presented to them, incorporated
by reference herein. This medical report again
clearly listed what occupational limitations
applied to her and what accommodations she
needed which would still permit her to perform
the essential functions of her job. The report
again also set forth specific information about
what Enica could not do at work. Enica asked to
stay at Jamaica Plain, but instead Enica was
given a notice of transfer on June 28, 2002 to
West Roxbury to a new position. The notice
included a document 'scope of practice' which
listed some accommodation to some of her
physical conditions, but which document ignored
many of the restrictions described by the doctor
in the said May 2002 letter and the other
medical letters in 1995 and 1996 described
above. She was still transferred and required to
do the work of the unit in pain due to the lack
of the requested and/or required accommodations
being provided for her to be able to do the job.

8. Due to the increased pain from the increased
required walking among other things at West
Roxbury after her transfer, the plaintiff's
representative requested on August 9, 2002 that
the facility reconsider the transfer among other
things, and asked the employer to comply with
the accommodations required in the doctors'
letters described above. As of October 1, 2002
the employer did not respond and the situation
had not changed so the employee filed 'formal'
discrimination charges with the VA.

9. At or about this time as a result of the
   additional physical activity at West Roxbury
   from which she was medically restricted but
   required to do, including but not limited to
   greatly increased walking every day compared to
   the walking required at Jamaica Plain, Enica
   suffered a 'worker compensation' injury arising
   out of or in the course of her employment, which
   disabled her from working. As a result she was
   required to leave work and make a claim for
   compensation.  This injury included but was not
   limited to developing a 'bursitis' condition in
   her hips and/or legs aggravating her previous
   disabilities and causing her great pain among
   other things.

10.    The    Veteran's    Administration    for
   discriminatory reasons denied her workers
   compensation claim and her requested
   accommodations by said claim.

11.    The 'Office of Worker's Compensation
   Program' of the Department of Labor, of the
   United States, to whom Enica appealed, reversed
   the January 2003 denial of her claim by the VA,
   in an appellate decision issued in May 2003
   incorporated by reference herein and marked
   Exhibit 'A'. The decision among other things
   found that Enica suffered an 'on the job injury'
   causing increased injury to her prior disabled
   conditions, requiring further accommodation and
   compensation from the VA since the failure to
   accommodate her had led to unsafe conditions at

work for Enica causing her the said workers
compensation injury.

12.     When she returned to work in 2003 after
recovering from the injury, the VA upon her
request, provided her a 'motorized' scooter as
an accommodation to her disabilities, to help
with the assigned walking at West Roxbury.

13.     Her supervisors however kept assigning her
to medical situations on the wards ignoring the
other physical restrictions on her of which they
knew including being excluded from medical
duties on the wards described in among other
places the 1995 and 1996 medical reports. These
assignments required physical actions with
patients to physically support or move them in
bed or walking, which the supervisors knew or
should have known Enica could not do because of
her other physical limitations described in the
prior medical reports.

14.     The supervisors also failed to notify or
seek or gain the help of the floor nurses where
she was assigned to aid these physical
restrictive conditions of Enica, and caused
Enica thereby continued embarrassment, physical
and emotional pain, when she could not perform
or get help to perform the assigned physical
tasks with the patients. These assignments
because of her physical limitations to help the
patients, put her patients to whom she was
assigned to do tasks she could not, in danger.
She so noted these matters in the records and
her supervisors retaliated by falsely claiming
she could not do appropriate medical jobs, from

which jobs she had been restricted by medical reports to the employer and in regard to which the supervisors were aware. The acts described in this paragraph in of themselves were directly discriminatory, and/or a refusal to provide reasonable accommodation and/or retaliatory.

15.     When Enica complained about the assignments described in 21 above, the supervisors 1) falsely charged her with inability to perform the required medical tasks such as supporting patients who might fall from bed or while walking to the lavatory, 2) put her on administrative leave requiring her to remain at home and not work, and then later in 2003 3) detailed Enica temporarily to the 'TAP' program so called, (a telephone medical triage system at the hospitals carried out by registered nurses.) She is not required at 'TAP' a nursing position, to walk push or lift.  She has successfully performed all of the nursing duties of this position without further accommodation.

16.     The VA published by e-mail a notice for an opening at Jamaica Plain for the position of 'Clinical Nurse Specialist' in June 5, 2003 incorporated by reference herein as Exhibit 'B', for which position Enica timely applied. She was at the time of her application eligible in all respects for the position as described. She believes and says she can perform the essential functions of the said position as described in the notice, without any accommodation.

17.    The VA then issued a Final Agency Report, which denied the plaintiff's charges for false reasons and failed to address her promotional allegations. The plaintiff says that such report itself continued the acts of handicap discrimination and/ or retaliation by among other things wrongfully denying the employer's responsibility under the applicable law to provide her reasonable accommodation and/or for acting in a retaliatory manner.

18.    After appropriate demands to the employer by the employee's agent, for information about the course of the application and the job, the employer in late April 2004, refused in writing to appoint the plaintiff to the position and the employee believes based on the events described above, the unusually long time to respond, that the VA gave false reasons by letter dated May 18, 2004, (incorporated by reference herein a Exhibit C), as part of the pattern of denying her a reasonable accommodation for her handicap and/or as direct handicap discrimination, and or retaliation for filing the formal charges described above.

19.    Enica says she believes based on the events described above that the real reason she was denied the promotional position was as part of a continuing pattern of denying her a reasonable accommodation for her handicap, of direct handicap discrimination and/or in retaliation for her filing the above-described discrimination claims against the VA its agents, servants and/or employees. As a result she

believes she has also been denied a promotion for which she was eligible and entitled, and thereby suffered also a loss of future higher income to which the position would have exposed her, and other employee benefits among other things.

h.   Incorporate answer to 1 above and include also additional documents provided in response to request for documents.

Signed under the pains and penalties of perjury this     day of May 2005.

                            _____
                              Lucia Enica

Objections
By her Attorney:


_____
Sanford A. Kowal