UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LUCIA ENICA,                    )
        Plaintiff,              )   CIVIL ACTION NO.
                                )   04-11468-DPW
            v.                  )
                                )
ANTHONY J. PRINCIPI, Secretary  )
of Veterans Affairs of the      )
Department of Veterans          )
Affairs,                        )
        Defendant.              )


MEMORANDUM AND ORDER
May 30, 2006

    Lucia Enica, a registered nurse employed by the Department
of Veteran Affairs ("VA"), brings this action alleging that the
VA failed to accommodate her disability in violation of the
Rehabilitation Act, 29 U.S.C. §§791, 794(a).  She also claims
that in retaliation for her attempts to seek accommodation, she
was subjected to a hostile work environment and denied a
promotion.  Each party has moved for summary judgment.

**I. BACKGROUND**

    Lucia Enica was born in Romania on December 14, 1952.  She
was diagnosed with poliomyelitis as a child.  The disease caused
her to suffer nerve damage and paralysis in her right leg
beginning at ten months of age.  When she was approximately
twelve years old, she fractured her right femur and underwent
several reconstructive surgeries, leaving her right leg shorter
than her left.  She also suffers from severe arthritis in her

-1-

right knee, and ankylosis, a condition causing stiffness, in her right ankle.  She walks with a limp, drives a specially equipped car, and has limited ability to lift.

Plaintiff has a bachelor's degree in nursing from New York University, a master's degree in psychiatric nursing from University of Massachusetts at Lowell, and nineteen years of experience working as a nurse.

In 1994, Plaintiff was hired as a Registered Nurse of Psychiatry at the VA hospital in Jamaica Plain.  Her responsibilities included providing basic care for patients with physical and emotional needs.  Before beginning work, she underwent a "fitness for duty" examination conducted by an occupational health physician assistant.  The physician assistant concluded that Plaintiff had no conditions limiting her ability to work as a psychiatric nurse.

In 1995, Plaintiff learned that the psychiatric unit in which she worked was closing.  Concerned that she might be transferred to a medical unit, she approached her manager, Mary Farren, and explained that because of her polio, she could not do the physical work required of nurses in medical units.  Plaintiff also told the Chief of Nursing, Carol Coulter, and the Assistant Chief of Nursing, Cecilia McVey, about her physical limitations. Plaintiff was subsequently transferred to another psychiatric unit within the Jamaica Plain campus.

The following year, in 1996, Plaintiff was asked to push a

patient on a stretcher to and from the electric compulsive shock therapy ("ECT") room and assist him into bed.  Plaintiff informed Beverly Reardon, her supervisor at the time, that she was in pain and could not do those tasks.  Reardon then asked Plaintiff to bring a doctor's note explaining her limitations and restrictions.

In May 1996, Plaintiff saw Dr. Richard Wright, an orthopedist.  He stated that she should avoid repetitive low back activity, repetitive or heavy pushing and pulling, and she was not suited for medical or surgical floor assignments.  Plaintiff submitted this doctor's note to Reardon, who then asked her to undergo another examination to determine if she was physically capable of performing the duties of a staff nurse.

Dr. John McA. Harris, III, Chief of Orthopedic Surgery at the VA, examined Plaintiff in July 1996.  Dr. Harris concluded that Plaintiff could not lift or carry 45 pounds and could not push 15 pounds.  In his progress notes, Dr. Harris wrote that he communicated his conclusions to Plaintiff and "suggested that she go to the Nursing Service with this information as soon as possible to work out with them exactly what will be done."  Id. Plaintiff claims that Dr. Harris never discussed his report with her, and although it was delivered to her supervisors in a timely manner, she did not see it until several years later.

The parties dispute the VA's response to Dr. Harris' report. Plaintiff alleges that immediately upon returning from the exam with Dr. Harris, her supervisor sent her to a medical unit where

she was asked to transport a patient in a wheelchair. Plaintiff claims that she was repeatedly required to take patients to ETC and assigned to medical units, where she was ordered to do physical tasks. In contrast, Assistant Chief of Nursing McVey claims that Plaintiff's job functions were modified according to Dr. Harris' evaluation, and Plaintiff was excused from carrying 45 pounds and pushing more than 15 pounds.

On April 9, 1997, Plaintiff filed a complaint with the EEOC against the VA alleging discrimination based on national origin and disability and retaliation against her for initiating EEO counseling. The EEOC concluded that Plaintiff had failed to establish her claims. Plaintiff did not appeal the decision because, she claims, she felt "confused and demoralized" and did not have enough money to hire a lawyer.

In 2000, the VA decided to integrate all inpatient care services at the Jamaica Plain campus with the West Roxbury and Brockton campuses. Over the next two years, the VA negotiated with the labor unions to transfer employees from Jamaica Plain to either of the two other campuses.

Plaintiff learned in May 2002 that her unit was slated to close. Again concerned that she could be transferred to a more physically demanding position, she informed Farren that she had been experiencing knee and back pain and could not walk long distances. She also expressed a desire to remain at the Jamaica Plain campus working in either the outpatient psychiatry unit or the substance abuse program.

-4-

Based on the advice of Lisa Cargill, a union representative, Plaintiff saw Dr. Robert A. Provost to obtain additional documentation of her physical restrictions and limitations.  In a note dated May 21, 2002, Dr. Provost recommended that Plaintiff not stand for more than five minutes at a time and avoid participating in psychiatric crisis intervention and walking rounds.  Plaintiff gave Dr. Provost's note to Farren, who, Plaintiff claims, became "very upset."  By this time, Plaintiff had obtained a copy of Dr. Harris' report and had begun to refuse to lift and pull patients.  She also began a dialogue with VA management via email regarding reasonable accommodations.

On June 28, 2002, Plaintiff met with William Warfield, Chief of Employee Relations, Karen Basset, Associate Director of Nursing and Patient Care, McVey, and Cargill concerning the closing of her unit at the Jamaica Plain campus.[1]  At this meeting, Plaintiff was informed that she was being transferred, along with ten other nurses, to a new crisis stabilization unit ("CSU") in West Roxbury.  Plaintiff raised the issue of her disabilities and need for accommodation.  Plaintiff was concerned that the distance between buildings in the West Roxbury campus would require more walking than she could safely do.  VA management, for its part, expected that because the West Roxbury unit contained only three beds, the work would be less physically

---

[1] The management and union organized meetings with each of the staff members who were affected by the closing of the Jamaica Plain unit.  Enica Deposition at 125, 126.

demanding and, therefore, more suitable for Plaintiff.

Plaintiff and VA management reached an agreement to modify Plaintiff's duties at the CSU in West Roxbury.  Specifically, Plaintiff was not required to participate in the physical aspect of any crisis intervention, including "Code Greens", and although not documented in writing, she claims she was excused from doing anything that she could not do.  She was still required to participate in the non-physical aspects of Code Greens, round on patients in the medical units, and consult on patients in the inpatient units.

Plaintiff began working in the CSU in July 2002.  On her first day there, she was asked to complete walking rounds through the entire hospital.  Because her unit had only one or two patients per week, Plaintiff and the other CSU nurses worked on the medical unit and participated regularly in walking rounds.  They also did "one on one" with agitated psychiatric patients housed on the inpatient units and supervised confused or agitated patients on a rotating schedule every hour.  This work entailed walking to different parts of the hospital.  Plaintiff estimates that she walked between one and a half and two and a half miles per day while at the CSU.

As a result of this walking, Plaintiff's leg and back pain worsened.  She took pain medication daily and continued working until September 2002, when the pain was so great that she nearly fell.  Plaintiff then asked to be transferred to an outpatient unit.  The VA denied this request, claiming that no such position

-6-

was available.  However, because Plaintiff claimed that she was
in extreme pain and could not perform an essential function of
her job, the VA placed her on fully paid administrative leave and
asked her to provide documentation from a physician detailing her
current physical limitations.

Plaintiff was on leave from September 9 to November 3, 2002.
During that time, she returned to Dr. Provost, who diagnosed her
with bursitis from excessive walking.  Dr. Provost noted that
Plaintiff had developed pain in her left hip from trying to
protect her right leg.  He recommended "strongly" that she be
transferred to an outpatient facility.

Also during that time, Plaintiff filed a workers'
compensation claim.  The Office of Workers' Compensation Programs
District Office of the Department of Labor denied Plaintiff's
request for compensation because it found that Plaintiff's
condition was not causally related to her job.  On appeal, the
DOL reversed this decision, finding that the excessive walking
that Plaintiff had been doing at work caused bursitis to develop
in her left hip and the Plaintiff was entitled to appropriate
benefits.

On August 21, 2002, prior to going on leave, Plaintiff
contacted an EEO counselor claiming that the accommodation
provided for her in the CSU was unsatisfactory.  She requested
immediate relief from walking to patient consults and rounds and
participating in "Code Greens" on foot.  She also asked to be
reassigned to the Outpatient Mental Health Clinic at West

-7-

Roxbury.  In a report dated October 10, 2002, the EEO counselor
noted that he attempted to resolve the situation by communicating
Plaintiff's grievances to Warfield.  Warfield responded that he
could not reassign Plaintiff because no positions were available.
However, after consulting with Plaintiff's attorney, he agreed to
provide her with a scooter for use in her current job.  Until the
scooter became available, Plaintiff would not be required to work
"more than she could manage."

The EEO counselor also apprised Plaintiff of her right to
file a discrimination complaint with the EEOC.  Plaintiff did so,
alleging that the VA discriminated against her on the basis of
disability in violation of the Rehabilitation Act.  This
complaint was denied on March 11, 2004.

Plaintiff returned to work on November 4, 2002, with a
motorized scooter.  The scooter successfully addressed
Plaintiff's walking problems, allowing her to do rounds and work
with patients in different buildings.  Shortly after returning to
work, however, Plaintiff was asked to do tasks that she
physically could not do.[2]  When Plaintiff objected, she was not
required to perform the tasks and was not disciplined for
objecting.

As a result of Plaintiff's inability to perform the

---

[2] Specifically, on November 6, 2002, the nurse in charge of
the medical unit ordered Plaintiff to physically restrain a
patient while his IVs were removed.  Enica Deposition at 147.  On
December 19, 2002, she was asked again to prevent a combative
patient from pulling out his IV lines.  Id. at 149.

requested tasks, the VA placed her on administrative leave again, pending the receipt of medical information describing in detail the scope of her limitations.  This leave period lasted from December 30, 2002, until April 7, 2003.  Plaintiff continued to receive full pay and benefits during this time.

When Plaintiff returned to work, she was assigned to the primary care Telephone Advisory Program ("TAP") at the Jamaica Plain Campus, the position that she currently holds.  The TAP job entails communicating with patients, pharmacies, and primary care providers by telephone.  No walking, lifting, bending, or carrying is required.

In December 2002, Dr. Robert W. McCarley sought funding for a Nurse Practitioner in the Outpatient Mental Health Clinic on the Jamaica Plain campus, and advertised the vacancy from February 14 to March 7, 2003.  Although seven people applied, Dr. McCarley decided not to fill the Nurse Practitioner position, choosing instead to recruit a Clinical Nurse Specialist.  The Clinical Nurse Specialist opening was posted from June 5 to June 26, 2003, and Plaintiff and one other person applied.

Dr. McCarley, however, decided that it was more economical to combine the resources for the nursing position with other available funds to hire a full time psychiatrist.[3]  He determined

---

[3] This information is drawn from paragraphs 7, 10 and 11 of the Warfield Affidavit.  Plaintiff has moved to strike these paragraphs on the grounds they describe "actions and decisions of a third party on its face, not those of the affiant."  The Federal Rules of Evidence allow a witness to testify to the actions of others, so long as the witness has personal knowledge

that this course of action would save the VA $39,000 annually.
Dr. McCarley advertised the psychiatrist position in October
2003, and hired Dr. Harriet Scheft on April 18, 2004.  Plaintiff
received no response from the VA regarding her application for
the Clinical Nurse Specialist position, and did not learn until
November 2005, that it had been eliminated.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(c).

Once the moving party shows that there is no genuine issue
of material fact, the nonmovant must produce evidence to show
that a trialworthy dispute exists.  Rathburn v. Autozone, Inc.,
361 F.3d 62, 66 (1st Cir. 2004).  A fact is "material" if it has
the "potential to affect the outcome of the suit under the
applicable law."  Santiago-Ramos v. Centennial P.R. Wireless
Corp., 217 F.3d 46, 52 (1st Cir. 2000).  A "genuine" issue is one
supported by such evidence that "a 'reasonable jury, drawing

---

of those actions.  See Fed. R. Evid. 602; McCormick on Evidence,
§10.  Here, Warfield claims that he has the requisite personal
knowledge, Warfield Affidavit ¶ 2, and no evidence to the
contrary has been offered.  Consequently, I find paragraphs 7,
10, and 11 admissible.

favorable inferences,' could resolve it in favor of the nonmoving party." Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (quoting Smith v. F.W. Morse & Co., 76 F.3d 413, 428 (1st Cir. 1996)).  "[C]onclusory allegations, improbable inferences, and unsupported speculation," are insufficient to establish a genuine dispute of fact.  Valez-Rivera v. Agosto-Alicea, 437 F.3d 145, 154 (1st Cir. 2006).

In ruling on a motion for summary judgment, a court must view "the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." Pacific Ins. Co., Ltd. v. Eaton Vance Management, 369 F.3d 584 (1st Cir. 2004).  The standard is the same where, as here, each party has moved for summary judgment.  Id.

### III. DISCUSSION

Plaintiff alleges in Count I that the VA violated §§ 501 and 504 of the Rehabilitation Act, 29 U.S.C. §§791, 794, by failing to make reasonable accommodations for her disability.[4]  In Count II, she claims that the VA retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et

---

[4] Section 501 of the Rehabilitation Act, which applies only to federal employers, requires the development of "an affirmative action program plan for the hiring, placement, and advancement of individuals with disabilities" that describes "the extent to which and methods whereby the special needs of employees who are individuals with disabilities are being met."  29 U.S.C. §791(b). Plaintiff has neither argued nor offered evidence to suggest that the VA has failed to comply with this provision.  Consequently, Plaintiff's motion for summary judgment on this issue is denied, and Defendant's motion is granted.  The remainder of this Memorandum regarding Count I focuses on §504.

seq, by failing to accommodate her, creating a hostile work environment, and denying her a promotion.

**A. Reasonable accommodation**

1. Collateral estoppel

Plaintiff contends that the May 12, 2003, workers' compensation decision rendered by the DOL ("DOL Decision") estops the VA from litigating the issue of whether it provided Plaintiff with reasonable accommodation.

Collateral estoppel, also known as issue preclusion, prohibits a party from litigating an issue that has previously been adjudicated. Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 327, n. 5 (1979). The doctrine serves the dual purposes of protecting litigants from multiple lawsuits and promoting judicial economy. Id. at 326. Collateral estoppel may be used defensively, to prevent a plaintiff from asserting a previously litigated claim against the defendant, or offensively, to foreclose the defendant from relitigating an issue that it previously lost. Id. at 326, n. 4.

Offensive use of collateral estoppel, the form Plaintiff seeks to invoke here, raises concerns of fairness to the defendant. Acevedo-Garcia v. Monroig, 351 F.3d 547, 574 (2003) (quoting Parklane Hosiery, 439 U.S. at 330-31). Consequently, the determination of whether the doctrine applies turns on "whether defendants received a full and fair opportunity to litigate their claims" in the first proceeding. Id. at 575. In this regard, the proponent of collateral estoppel must establish

-12-

> (1) that the issue to be precluded is the same as that disputed in a prior proceeding, (2) that the issue was actually litigated in the earlier proceeding, (3) that the issue was determined by a valid and binding final judgment or order, and (4) that the determination of the issue in the prior proceeding was essential to the final judgment or order.

Plumley v. Southern Container, Inc., 303 F.3d 364, 373 (1st Cir. 2002).

The VA contends that applying this test is unnecessary because workers' compensation proceedings per se have no preclusive effect in federal court. It claims that the two proceedings differ in terms of quality and extensiveness of procedures. Specifically, it points to the admissibility of hearsay evidence and the absence of government counsel in workers' compensation proceedings. See Federal Employee's Compensation Act Procedure Manual, 2-0809-10(2)(c).

Differences in procedure and substantive standards between an administrative agency and the federal courts may make collateral estoppel inappropriate. Bath Iron Works Corp. v. Dir., Office of Workers' Compensation Programs, U.S. Dept. of Labor, 125 F.3d 18, 21 (1st Cir. 1997). The First Circuit has counseled that "[a]lthough the tendency is plainly in favor of applying collateral estoppel in administrative contexts, the subject is a complex one, with many variations; and it is perhaps well not to generalize too broadly." Id. Accordingly, determination of whether collateral estoppel applies to a particular administrative agency decision is best made on a case-by-case basis, using the well-established four-factor test

described above.

I need look no farther than the first factor to conclude
that collateral estoppel does not apply in this case.  The first
factor restricts the reach of collateral estoppel "to situations
where the matter raised in the second suit is identical in all
respects with that decided in the first proceeding." <u>Faigin v.
Kelly</u>, 184 F.3d 67, 78 (1st Cir. 1999).  The DOL in this case
addressed and resolved a single issue: whether the bursitis
afflicting Plaintiff's left leg in September 2002, was caused by
her walking at work.  In contrast, the issue here is whether the
VA violated the Rehabilitation Act by failing to provide
Plaintiff with reasonable accommodations for her disability.
This issue implicates a different and wider range of
considerations than the source of Plaintiff's left leg pain in
September 2002, <u>e.g.</u>, whether Plaintiff had a "disability" for
purposes of the Act;[5] whether she was able to perform the
essential functions of her job, with or without reasonable
accommodation; whether the VA was aware of the extent of her
disability; the feasibility of any requested accommodation; the
interactive process between Plaintiff and the VA.  <u>See Calero-
Cerezo v. U. S. Dept. of Justice</u>, 355 F.3d 6, 20 (1st Cir. 2004).

---

[5] A "disability" under the Rehabilitation Act is "a physical
or mental impairment which substantially limits one or more of an
individual's major life activities." <u>Calero-Cerezo v. U.S. Dept.
of Justice,</u> 355 F.3d 6, 20 (1st Cir. 2004).  For purposes of
workers' compensation, "disability" means "the incapacity,
because of an employment injury, to earn the wages the employee
was receiving at the time of injury."  20 C.F.R. §10.5(f).

To be sure, the DOL made factual findings that are relevant to the question of reasonable accommodation.[6] However, "the mere presence of a modicum of factual commonality does not establish the requisite identity of issues for purposes of collateral estoppel.  Rather, the issues must be defined by reference to the judicial determinations at stake."  <u>Faigin</u>, 184 F.3d at 78. Here, the judicial determinations in the two proceedings are distinct, and therefore, collateral estoppel is inapplicable.[7]

<u>2. Failure to accommodate</u>

Having concluded that principles of collateral estoppel do not preclude litigation of whether the VA has violated the Rehabilitation Act, I turn to the merits of that claim.  Section 504 of the Rehabilitation Act provides in relevant part:

> No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive Agency.

29 U.S.C. §794(a).

In addition to prohibiting disparate treatment, §504 imposes an affirmative duty on employers to offer a "reasonable

---

[6] For example, the DOL found that Plaintiff submitted medical evidence of her disability to her employer in an attempt to seek accommodation.

[7] It follows from the conclusion that the DOL did not consider all the issues implicated here that Plaintiff cannot satisfy the remaining three requirements for collateral estoppel. If the DOL never considered the question of reasonable accommodation, certainly that issue was not litigated, adjudicated, and essential to the DOL's holding.

accommodation" to a disabled employee.  <u>Calero-Cerezo</u>, 355 F.3d

at 20.  To assert a claim for failure to accommodate, Plaintiff

must establish

> (1) that she suffered from a 'disability' within the meaning
> of the statute; (2) that she was a qualified individual in
> that she able to perform the essential functions of her job,
> either with or without a reasonable accommodation, and (3)
> that, despite her employer's knowledge of her disability,
> the employer did not offer a reasonable accommodation for
> the disability.

<u>Id.</u>, 355 F.3d at 20.[8]

Plaintiff easily satisfies the first requirement.  A

"disability" for purposes of the Rehabilitation Act is either

"(a) a physical or mental impairment which substantially limits

one or more of an individual's major life activities; (b) a

record of such impairment; or (c) being regarded as having such

an impairment."  <u>Id.</u>  There is no doubt, and the parties do not

dispute, that Plaintiff's obvious physical limitations

significantly restrict her ability to walk, an activity of

central importance to daily life.

The second requirement also is undisputed.  An "essential

function" is a "fundamental job duty associated with a particular

position."  <u>Id.</u> at 21.  It includes technical skills and

experience as well as other individual or idiosyncratic

characteristics.  <u>Id.</u>  In terms of technical skills and

experience, Plaintiff, with an undergraduate nursing degree, a

---

[8]  The following analysis draws on caselaw construing both
the Rehabilitation Act and the Americans with Disability Act
("ADA").  The same standards apply to claims under both Acts.
<u>Calero-Cerezo</u>, 355 F.3d at 11, n.1.

masters degree in psychiatric nursing, and nearly twenty years of
nursing experience, appears qualified to perform the duties of a
psychiatric nurse at the VA.  In addition to those skills,
nursing positions at the VA also require varying degrees of
physical strength and mobility.[9]  As is evident from the record,
Plaintiff cannot perform physically demanding tasks without
appropriate accommodation.  With such accommodation, such as job
modification or assignment to a unit where less physical work is
required, however, it is clear that Plaintiff would be, and has
been, able to perform the essential functions of a nurse at the
VA.

The dispute in this case centers on the third requirement:
whether the VA knew of Plaintiff's disability and failed to
provide reasonable accommodation.  This determination involves a
two-step analysis.  Id. at 23.  First, the plaintiff must prove
"not only that the proposed accommodation would enable her to
perform the essential functions of her job, but also that, at
least on the face of things, it is feasible for the employer
under the circumstances."  Id. (quoting Reed v. LePage Bakeries,
Inc., 244 F.3d 254, 259 (1st Cir. 2001)).  In making this
showing, plaintiff must also prove that she requested
accommodation.  Id.  The request must be "sufficiently direct and

_____

[9] The CSU position that Plaintiff held, for example,
required the ability to move around the hospital; nurses in the
medical unit routinely provide physical assistance to patients.
In contrast, nurses in the TAP unit, where Plaintiff is currently
stationed, work while seated.

specific" to put her employer on notice of her need for accommodation.  Id.

If plaintiff succeeds in carrying this burden, the defendant "may attempt to prove that, in fact, the proposed accommodation was not feasible and would constitute 'undue' hardship."  Id. Financial constraints, administrative burdens, and other costs affect the feasibility of a proposed accommodation.  Reed, 244 F.3d at 259-60.

A sufficient request for accommodation by the plaintiff also triggers a duty on the part of the employer to engage in an interactive process with the employee to determine an appropriate accommodation.  Tobin v. Liberty Mutual Ins. Co, 433 F.3d 100, 108 (1st Cir. 2005).  Although "the scope of the employer's obligation in this process is not crystal clear,"  the employer has "at least some responsibility in determining the necessary accommodation."  Calero-Cerezo, 355 F.3d at 24.  The interactive process "requires a great deal of communication between the employee and employer."  Id.  An employer's failure to participate amounts to a violation of the Rehabilitation Act; but an employer is not liable if it makes "reasonable efforts both to communicate with the employee and provide accommodations based on the information it possessed."  Phelps v. Optima Health, Inc., 251 F.3d 21, 28 (1st Cir. 2001) (quoting Beck v. Univ. of Wis. Bd. of Regents, 75 F.3d 1130, 1137 (7th Cir. 1996)).

Plaintiff alleges in her Complaint that between 1995 and the present, she was continuously denied reasonable accommodation for

-18-

her disability.[10]  Specifically, she alleges that she was
required to walk in excess of her physical capability, and that
the VA knew or should have known about her limitations.

The record shows that Plaintiff explicitly notified the VA
of her physical restrictions and requested accommodations several
times between 1995 and the present.  The first request was in
1995, when, upon learning that her unit was to be closed,
Plaintiff informed her supervisor, Mary Farren, and other
managers that her disability prevented her from working on a
medical unit.  The VA responded by approving her requested
accommodation: reassignment to another psychiatric ward.

The second notification occurred in 1996, after Plaintiff
was asked to push a patient on a stretcher.  At that time,
Plaintiff informed Reardon that pushing patients on stretchers
was beyond the scope of her physical capabilities.  In response,
Reardon asked Plaintiff to have a doctor document her physical
limitations.  The doctor limited the amount of weight that
Plaintiff could push or carry, and the VA, through McVey, claims
that it modified her responsibilities accordingly.  Plaintiff

---

[10] The VA contends that Plaintiff is barred from asserting
claims dating more than 45 days before she sought EEO counseling
on August 21, 2002.  See 29 C.F.R. §1614.105(a)(1).  Plaintiff's
claims for reasonable accommodation, and retaliation as well,
allege repeated conduct, as opposed to discrete acts.  Under
these circumstances, so long as an act contributing to the claim
occurs within the requisite time period, as is the case here, the
entire period of the allegedly discriminatory conduct may be
considered by a court for the purposes of determining liability.
National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 117
(2002).

claims that it did not.

Between the time that Dr. Harris wrote his report in 1996 and May 2002, Plaintiff apparently did not complain to any managers about being assigned to physical tasks.[11]  The evidence before me shows that Plaintiff made her third request for accommodation in May 2002, when she informed Farren that she had been experiencing knee and back pain, could not walk long distances, and wished to remain at the Jamaica Plain campus working in either the outpatient psychiatry unit or the substance abuse program.  An email exchange ensued between Plaintiff and VA management discussing possible accommodations.

The meeting on June 28, 2002, between Plaintiff and her

_____

[11] In her deposition, Plaintiff states that she did not speak to management about her physical condition between 1996 and 2002, but she claims the opposite in her affidavit.  Enica Deposition at 78; Enica Affidavit #15.  It is well-established that "when an interested witness has given clear answers to unambiguous questions, [she] cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed."  Torres v. E.I. Dupont De Nemours & Co., 219 F.3d 13, 20 (1st Cir. 2000)(internal quotations and citations omitted).

Plaintiff's affidavit neither provides such an explanation nor refers to evidence that she did contact her managers.  She points to the EEO Complaint that she filed in 1997, but that document, and the ensuing EEOC decision, make no mention of any complaints she made to supervisors after April 1996.  Ironically, she argues in the EEOC complaint that because of her disability, her duties were too restricted, preventing her from maintaining her nursing skills.  Plaintiff insists that between 1996 and 2002, she "was trying the best [she] could to get some fair treatment and to obtain reasonable working conditions," but this statement alone is insufficient to create a genuine dispute as to whether Plaintiff informed her managers between April 1996 and May 2002 of her physical limitations.

supervisors constituted a fourth request for accommodation.  At that time, Plaintiff and management reached an agreement for restricting her duties in the CSU.  She was not required to participate in crisis intervention or "do anything she could not do."

Plaintiff contacted an EEO counselor August 2002, explained that she was in pain from walking, and pressed for more restricted duties and reassignment to an outpatient unit.  On September 2002, Plaintiff informed her supervisors of her pain and asked for the same accommodations that she pressed for with the EEO counselor.  The VA responded that no outpatient position was available, and placed Plaintiff on administrative leave until a doctor could examine her again and describe her limitations.  The EEO counselor also communicated Plaintiff's concerns to VA management, who agreed to supply Plaintiff with a scooter.

After returning to work with the scooter, Plaintiff notified her managers twice, once in November 2002, and once in December, that she could not restrain patients as requested.  Her managers responded by excusing her from those tasks, and ultimately placing her on administrative leave again.  Finally, in April 2003, the VA accommodated Plaintiff by placing her in the TAP, which requires no walking, pushing, or lifting, and no restraining patients.

This record shows that Plaintiff made at least eight requests for accommodation between 1995 and 2003.  The VA responded to each request, by either granting Plaintiff's

suggested accommodation or presenting an alternative.  To be sure, the VA did not in each instance provide Plaintiff with her preferred accommodation, but it is not legally obligated to do so.  See Phelps, 251 F.3d at 27 ("Reasonable accommodation may include reassignment to a vacant position,... [but] an employer is not required by the ADA to create a new job for an employee, nor to re-establish a position that no longer exists").  The VA is legally obligated only to engage, in good faith, in an interactive process with Plaintiff and to provide her with a reasonable accommodation.  Id.  Here, no reasonable jury could find that the VA failed to engage in such a process or that Plaintiff was not ultimately accommodated.[12]

_____

[12] The parties dispute the VA's response to Dr. Harris' 1996 report in which he restricted Plaintiff to pushing less than 15 pounds and carrying less than 45 pounds.  The VA claims that it limited Plaintiff's duties accordingly, but Plaintiff claims that she was still required to transport patients and work in medical units.

This dispute need not be resolved, however, to determine whether the VA provided Plaintiff with reasonable accommodation. Regardless of which party's version is accurate, the record before me supports only the proposition that Plaintiff did not inform her supervisors that she was in need of further accommodation until 2002.  See note 10, supra.  The interactive process between employer and employee requires the good faith participation of both parties.  Phelps v. Optima Health, Inc., 251 F.3d 21, 28 (1st Cir. 2001).  "Liability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown."  Id. (quoting Beck v. Univ. of Wisc. Bd. of Regents, 75 F.3d 1130, 1137 (7th Cir. 1996)).  Here, there is no evidence the VA obstructed the process in any way; Plaintiff's silence left the VA to guess whether its accommodations, or lack thereof, were proving appropriate.  See Beck, 75 F.3d at 1137.  Any breakdown in the interactive process during that time period was therefore not the responsibility of the VA, and liability under the Rehabilitation Act does not follow.  Id.; Phelps, 251 F.3d at 28.

Indeed, Plaintiff does not herself dispute that the VA participated in the required interactive process or even that the process was successful.  The gravamen of Plaintiff's claim appears to be that process took too long.  She contends that her conspicuous limp, history of polio, and handicap license plates put the VA on notice at all times of her physical restrictions, and she should never have been asked to perform duties that she was obviously incapable of performing.  The fact that she was asked to do so is evidence, she contends, of the VA's bad faith and lack of effort.  The VA, for its part, claims that it accommodated Plaintiff based upon its knowledge of her limitations at the time, and as she brought new restrictions to its attention, it responded promptly and accordingly.

Although "the employer has at least some responsibility in determining the necessary accommodation," Beck v. Univ. of Wisc. Bd. of Regents, 75 F.3d 1130, 1135 (7th Cir. 1996), it "has no duty to divine the need" for accommodation.  Reed, 244 F.3d at 261.  The fitness for duty exam that Plaintiff took in 1994 shows, and Plaintiff herself admits, that her disabilities in no way interfered with her work as a psychiatric nurse until 1996, when she was asked to transport a patient on a gurney.  Between 1996 and 2002, the record shows that she was able to perform nursing duties with restrictions related only to pushing and carrying.  Her walking problems did not arise until 2002, at which point, she was accommodated with a scooter.  But Plaintiff's obvious physical impairment alone did not provide

-23-

notice of the scope of her disability.

Under these circumstances, merely asking Plaintiff to perform tasks that she proved incapable of performing does not indicate bad faith on the part of the VA.  To the contrary, the record shows that the VA made an effort to understand the extent of Plaintiff's disability.  In addition to the fact that the VA engaged in several dialogues with Plaintiff about her disabilities, it requested three doctor's reports detailing the nature of Plaintiff's restrictions.

With respect to the length of time that it took for the VA to accommodate Plaintiff, again, there is no evidence of bad faith.  Plaintiff alleges that during the two months she worked at the CSU, she developed bursitis in her left leg because the VA failed to accommodate her in a timely manner.  Plaintiff contacted an EEO counselor on August 21, 2002, to report the excessive walking that she was required to do, but her grievance was not communicated to her supervisor until September 6, 2002.  When she complained directly to her managers on September 9, they placed her on leave that very day.  An inference of bad faith cannot reasonably be drawn from such facts.

Plaintiff analogizes this case to Tobin v. Liberty Mutual Ins. Co., 433 F.3d 100 (1st Cir. 2005).  In Tobin, the plaintiff insurance salesman had bipolar disorder which affected his ability to concentrate and organize.  Liberty Mutual engaged in a "great deal of discussion about Tobin's difficulties" and company officials took "significant action" to accommodate him.  Id. at

-24-

109. However, Liberty Mutual did not provide him with the additional service support and sales accounts that he requested, and ultimately fired him for poor performance. <u>Id.</u> at 103. In finding that a triable question of fact existed with respect to Tobin's reasonable accommodation claim, the First Circuit held that "it is possible for an employer to satisfy its duty to engage in an interactive process and yet still fail to provide a reasonable accommodation to a disabled employee." <u>Id.</u> at 108, n.7.[13]

Plaintiff contends that a similar situation exists here -- the VA engaged in an interactive process, but "stonewalled" in repeatedly assigning Plaintiff tasks that it knew she was incapable of performing. There is, however, insufficient evidence in the record to support this characterization of the VA's actions. For each specific, direct request for accommodation that Plaintiff made, the VA responded by granting her request or an alternative. It participated in an interactive process with Plaintiff over a period of years, apparently in good faith, to explore and respond to the scope of that disability. The interactive process appears to have been successful and Plaintiff is currently employed in a position that fully accommodates her disability. To be sure, all of this interactive

---

[13] A jury recently returned a $1.4 million verdict in Tobin's favor, finding that Liberty Mutual failed to reasonably accommodate him. <u>Tobin v. Liberty Mutual Ins. Co.</u>, 01-11979-DPW (May 9, 2006).

process was not instantaneous; but the process of adjustment and accommodation necessarily takes some time.  From this record, no jury could reasonably find that the VA failed to fulfill its obligations under the Rehabilitation Act.

**B.   Retaliation**

Plaintiff alleges in Count II that the VA retaliated against her by failing to provide reasonable accommodations, creating a hostile work environment, and denying her a promotion.

To prove a claim of retaliation under Title VII, a plaintiff must show that

> (1) she engaged in protected conduct; (2) she experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action.

Calero-Cerezo, 355 F.3d at 25.  Once the plaintiff has made a prima facie showing of retaliation, the burden-shifting analysis articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) applies.  Id.  Under this framework, the defendant must articulate a legitimate, non-retaliatory reason for its employment decision.  Id.  If the defendant does so, the burden shifts to the plaintiff to show that "the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus."  Id.

Plaintiff clearly engaged in protected conduct when she sought accommodations from the VA management, filed a workers' compensation claim, and filed complaints with the EEOC.  See Valentin-Almeyda v. Aguadilla, __F.3d __, 2006 WL 1229693, *6

-26-

(1st Cir. May 9, 2006) ("Protected conduct includes not only the filing of administrative complaints, but also complaining to one's supervisors") (internal citations omitted).  Her claim fails, however, on elements two and three.

An adverse employment action typically involves "a discrete change in the terms and conditions of employment," such as a discharge, demotion, or reduction in pay.  Noviello v. City of Boston, 398 F.3d 76, 88 (1st Cir. 2005).  The creation and perpetuation of a hostile work environment, if sufficiently severe or pervasive, may in and of itself constitute an adverse employment action.  Id. at 89.  The inquiry into whether an employment action is adverse for retaliation purposes is an objective one; "the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996).

Plaintiff identified three theories of adverse employment actions she allegedly suffered: (1) failure to accommodate her disability, (2) a hostile work environment, and (3) denial of a promotion.[14]  Because I have found that the VA did not deny her reasonable accommodation, the first theory has no merit.  Even if I had not so found, Plaintiff was not discharged, demoted, or divested of significant work responsibilities by the alleged failure to accommodate.  She was not disciplined and she

---

[14] Plaintiff alleged these three theories in her complaint but argued only the third in her briefs.

continued to receive full pay and benefits throughout the entire time period at issue, even when she was on leave. Thus, any failure to accommodate resulted in no discrete change in the terms and conditions of her employment and consequently cannot support a retaliation claim.

As to the second theory, in order to prove a hostile work environment, Plaintiff must show "that she was subjected to severe or pervasive harassment that materially altered the conditions of her employment." Noviello, 398 F.3d at 92. Based on the totality of the circumstances, the harassment must be objectively and subjectively offensive; that is, a reasonable person would find it hostile or abusive, and the victim must in fact have perceived it to be so. Id. The goal of the inquiry is "to distinguish between the ordinary, if occasionally unpleasant vicissitudes of the workplace and actual harassment." Id. In a retaliation case, ordinary unpleasantness includes the effects of workers "taking sides." Id. "It is only those actions, directed at complainant, that stem from retaliatory animus which may be factored into the hostile work environment calculus." Id. at 93.

From Plaintiff's perspective, being asked from time to time over a period of years to do tasks that she could not physically perform may well have been emotionally and physically distressing and harassing. Irrespective of whether a reasonable person would share the same sense of distress, however, there is no basis for finding the tasks which gave rise to that sense stemmed from retaliatory animus against her for engaging in protected conduct.

-28-

Plaintiff's third allegation, denial of a promotion, fails because she has not established a causal link between her protected conduct and the fact that she was not hired to fill the Clinical Nurse Specialist position.  Indeed, she offers no evidence on this point apart from conclusory statements in her affidavit that the VA acted to punish her.

Even if such a link were established, the VA has presented a legitimate, non-discriminatory reason for not selecting Plaintiff for the Clinical Nurse Specialist position: it was financially beneficial to eliminate the nursing position and hire a psychiatrist instead.  In support, the VA offered evidence that it never filled the nursing vacancy, it advertised a psychiatrist position, it hired a psychiatrist, and it experienced a cost saving of $39,000.  In response, Plaintiff states only that she was qualified and never received a response from the VA with regards to her application.  Based on this evidence, no reasonable jury could find that the VA's proffered reason was pretextual, and consequently, Plaintiff's retaliation claim as now argued, see Note 12, supra, with reference to her third theory, cannot survive summary judgment.

## IV. CONCLUSION

For the reasons set forth more fully above, I DENY
Plaintiff's motion for summary judgment and GRANT Defendant's
cross-motion.

/s/ Douglas P. Woodlock

_____

DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE